# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

—————

No. 12-60264

—————

United States Court of Appeals
Fifth Circuit

**FILED**

August 20, 2015

Lyle W. Cayce
Clerk

TAYLOR BELL; DORA BELL, individually and as mother of Taylor Bell,

    Plaintiffs - Appellants

v.

ITAWAMBA COUNTY SCHOOL BOARD; TERESA MCNEECE, Superintendent of Education for Itawamba County, Individually and in her official capacity; TRAE WIYGUL, principal of Itawamba Agricultural High School, Individually and in his official capacity,

    Defendants - Appellees

—————————————

Appeal from the United States District Court
for the Northern District of Mississippi

—————————————

Before STEWART, Chief Judge, and JOLLY, DAVIS, JONES, SMITH, BARKSDALE, DENNIS, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, HAYNES, GRAVES, HIGGINSON and COSTA, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Away from school or a school function and without using school resources (off-campus speech), Taylor Bell, a student at Itawamba Agricultural High School in Itawamba County, Mississippi, posted a rap recording containing threatening language against two high school teachers/coaches on the Internet (first on his publicly accessible Facebook profile page and then on YouTube),

No. 12-60264

intending it to reach the school community. In the recording, Bell names the two teachers and describes violent acts to be carried out against them. Interpreting the language as threatening, harassing, and intimidating the teachers, the Itawamba County School Board took disciplinary action against Bell.

Bell claims being disciplined violated his First Amendment right to free speech. On cross-motions for summary judgment, the district court ruled, *inter alia*: the school board, as well as the school-district superintendent, Teresa McNeece, and the school principal, Trae Wiygul, acting in their official capacities (the school board), acted reasonably as a matter of law. *Bell v. Itawamba Cnty. Sch. Bd.*, 859 F. Supp. 2d 834 (N.D. Miss. 2012).

Primarily at issue is whether, consistent with the requirements of the First Amendment, off-campus speech directed intentionally at the school community and reasonably understood by school officials to be threatening, harassing, and intimidating to a teacher satisfies the almost 50-year-old standard for restricting student speech, based on a reasonable forecast of a substantial disruption. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 514 (1969) (infringing otherwise-protected school speech requires "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities"). Because that standard is satisfied in this instance, the summary judgment is **AFFIRMED.**

I.

On Wednesday, 5 January 2011, Bell, a high-school senior, posted a rap recording on his public Facebook profile page (and later on YouTube), using what appears to be a representation of a Native American as the rap recording's cover image. (His high-school mascot is a Native American.) The

No. 12-60264

recording, in part, alleges misconduct against female students by Coaches W. and R.

Although there are three different versions of the transcribed rap recording in the summary-judgment record, the school board stipulated, at the preliminary-injunction hearing for this action, to the accuracy of the following version provided by Bell, who refers to himself in the recording as "T-Bizzle". (Accordingly, except for deleting part of both coaches' names, the numerous spelling and grammatical errors in the following version are not noted.)

> Let me tell you a little story about these Itawamba coaches / dirty ass niggas like some fucking coacha roaches / started fucking with the white and know they fucking with the blacks / that pussy ass nigga W[.] got me turned up the fucking max /
>
> Fucking with the students and he just had a baby / ever since I met that cracker I knew that he was crazy / always talking shit cause he know I'm from daw-city / the reason he fucking around cause his wife ain't got no tidies /
>
> This niggha telling students that they sexy, *betta watch your back / I'm a serve this nigga, like I serve the junkies with some crack* / Quit the damn basketball team / the coach a pervert / can't stand the truth so to you these lyrics going to hurt
>
> What the hell was they thinking when they hired Mr. R[.] / dreadlock Bobby Hill the second / He the same see / Talking about you could have went pro to the NFL / Now you just another pervert coach, fat as hell / Talking about you gangsta / drive your mama's PT Cruiser / *Run up on T-Bizzle / I'm going to hit you with my rueger*
>
> Think you got some game / cuz you fucking with some juveniles / you know this shit the truth so don't you try to hide it now / Rubbing on the black girls ears in the

3

No. 12-60264

gym / white hoes, change your voice when you talk to them / I'm a dope runner, spot a junkie a mile away / came to football practice high / remember that day / I do / to me you a fool / 30 years old fucking with students at the school

Hahahah / You's a lame / and it's a dam shame / instead you was lame / eat shit, the whole school got a ring mutherfucker

Heard you textin number 25 / you want to get it on / white dude, guess you got a thing for them yellow bones / looking down girls shirts / drool running down your mouth / *you fucking with the wrong one / going to get a pistol down your mouth / Boww*

OMG / Took some girls in the locker room in PE / Cut off the lights / you motherfucking freak / Fucking with the youngins / because your pimpin game weak / How he get the head coach / I don't really fucking know / But I still got a lot of love for my nigga Joe / And my nigga Makaveli / and my nigga codie / W[.] talk shit bitch don't even know me

Middle fingers up if you hate that nigga / Middle fingers up if you can't stand that nigga / *middle fingers up if you want to cap that nigga / middle fingers up / he get no mercy nigga*

(Emphasis added.)

At the very least, this incredibly profane and vulgar rap recording had at least four instances of threatening, harassing, and intimidating language against the two coaches:

1. "betta watch your back / I'm a serve this nigga, like I serve the junkies with some crack";
2. "Run up on T-Bizzle / I'm going to hit you with my rueger";
3. "you fucking with the wrong one / going to get a pistol down your mouth / Boww"; and

4

4. "middle fingers up if you want to cap that nigga / middle fingers up / he get no mercy nigga".

Bell's use of "rueger" [sic] references a firearm manufactured by Sturm, Ruger & Co.; to "cap" someone is slang for "shoot".

A screenshot of Bell's Facebook profile page, taken approximately 16 hours after he posted the rap recording, shows his profile, including the rap recording, was open to, and viewable by, the public. In other words, anyone could listen to it.

On Thursday, 6 January, the day after the recording was posted, Coach W. received a text message from his wife, informing him about the recording; she had learned about it from a friend. After asking a student about the recording, the coach listened to it at school on the student's smartphone (providing access to the Internet). The coach immediately reported the rap recording to the school's principal, Wiygul, who informed the school-district superintendent, McNeece.

The next day, Friday, 7 January, Wiygul, McNeece, and the school-board attorney, Floyd, questioned Bell about the rap recording, including the veracity of the allegations, the extent of the alleged misconduct, and the identity of the students involved. Bell was then sent home for the remainder of the day.

Because of inclement weather, the school was closed through Thursday, 13 January. During Bell's resulting time away from school, and despite his having spoken with school officials about his rap recording, including the accusations against the two coaches, Bell created a finalized version of the recording (adding commentary and a picture slideshow), and uploaded it to YouTube for public viewing.

Bell returned to school when it reopened on Friday, 14 January; he was removed from class midday by the assistant principal and told he was suspended, pending a disciplinary-committee hearing. (He was permitted to

remain in the school commons until the school bus he rode arrived at the end of the day.)  By letter that day to Bell's mother, the superintendent informed her:  Bell's suspension would continue until further notification; and a hearing would be held to consider disciplinary action for Bell's "alleged threatening intimidation and/or harassment of one or more school teachers".  The listed, possible basis for such action was consistent with the school district's administrative disciplinary policy, which lists "[h]arassment, intimidation, or threatening other students and/or teachers" as a severe disruption.

The disciplinary-committee hearing, originally scheduled for Wednesday, 19 January, was delayed at Bell's mother's request; it was held on Wednesday, 26 January.  Although there is no transcript of the hearing, it was recorded; that recording is in the summary-judgment record.    The hearing was facilitated by the school-board attorney, Floyd; three disciplinary-committee members were present, as well as the school principal and Bell, his mother, and their attorney.

The hearing began with the principal's providing a summary of events, after which the YouTube version of the rap recording was played.  Among the disciplinary-committee members' questions, one member asked Bell whether he had reported the alleged misconduct to school officials.  Bell explained he had not done so because he believed they would ignore his complaints.  Instead, he made the rap recording because he knew people were "gonna listen to it, somebody's gonna listen to it", acknowledging several times during the hearing that he posted the recording to Facebook because he knew it would be viewed and heard by students.  Moreover, he explained that at least 2,000 people had contacted him about the rap recording in response to the Facebook and YouTube postings.

One of the committee members asked Bell why he had posted a new version of the rap recording on YouTube, after school officials had discussed with him his posting it on Facebook.  Bell gave a few (and somewhat conflicting) explanations:  the Facebook version was a raw copy, so he wanted a finalized version on YouTube; the Facebook version was for his friends and "people locally" to hear, whereas the YouTube version was for music labels to hear; and he posted the YouTube version with a slideshow of pictures to help better explain the subject matter of the recording (his Facebook version only included a brief explanation of the backstory in the caption to the rap recording).

Although Bell's attorney, at one point, attempted to discuss the misconduct of the coaches alleged in the rap recording, the school-board attorney redirected the proceeding to its purpose:  to resolve whether Bell threatened, harassed, and intimidated the teachers; and, to decide whether his suspension should be upheld.  In numerous instances, the school-board attorney emphasized this purpose, noting Bell's "comments made [in the recording that] 'you've f—ed with the wrong one / going to get a pistol down your mouth / POW'[,] those are threats to a teacher".

Bell contested the school-board attorney's interpretation, responding: "Well that ain't really what I said"; and then provided what he described as the written "original copy" of what had been recorded.  (It is unclear from the disciplinary-committee-hearing recording, or other parts of the summary-judgment record, which copy Bell provided.)  Bell explained he did not mean *he* was going to shoot anyone, but that he was only "*foreshadowing* something that might happen".  (Emphasis added.)  But, he agreed that individuals "outside the school setting" had made "certain statements" to his mother that "'put a pistol down your mouth'[,] that is a direct threat".

No. 12-60264

Near the end of the disciplinary-committee hearing, Bell explained again: he put the recording on Facebook and YouTube knowing it was *open to public viewing*; part of his motivation was to "increase awareness of the situation"; and, although he did not think the coaches would hear the recording and did not intend it to be a threat, he knew students would listen to it, later stating "students all have Facebook".

On 27 January, the day after the hearing, the school-board attorney informed Bell's mother by letter that: the disciplinary committee had determined "the issue of whether or not lyrics published by Taylor Bell constituted threats to school district teachers was vague", but that the publication of the recording constituted harassment and intimidation of two teachers, in violation of school-district policy and state law; as a result, the disciplinary committee recommended to the school board that Bell's seven-day suspension be upheld and that he be placed in the county's alternative school for the remainder of the nine-week grading period (approximately six weeks); Bell would not be "allowed to attend any school functions and [would] be subject to all rules imposed by the Alternative School"; and "[he would] be given time to make up any work missed while suspended or otherwise receive a 0, pursuant to Board policy".

After being informed of the disciplinary-committee's recommendation, Bell's attorney informed the school-board attorney, by 31 January telephone call, that: Bell wished to appeal to the school board the disciplinary-committee's recommendation; and, although Bell and his mother were expected to appear at the board meeting on 7 February, they would be without counsel because he was unable to attend due to a scheduling conflict.

On 7 February, the school board, after being presented with a recitation of the recording, unanimously found: Bell "threatened, harassed and

8

intimidated school employees". (The only document in the record from the school-board meeting is the minutes, which state: "Chairman Tony Wallace entertained a motion by Clara Brown to accept the discipline recommendation of the Discipline Committee regarding student with MSIS #000252815 (I.A.H.S.) and finding that this student threatened, harassed and intimidated school employees. Wes Pitts seconded the motion. Motion Carried Unanimously.") In other words, unlike the earlier-described disciplinary committee findings, which do not characterize the rap recording as threatening (instead, finding that point "vague"), the school board found Bell had not only harassed and intimidated the teachers, but had also threatened them.

By 11 February letter to Bell's mother, the school-board attorney explained the board's findings: "Bell did threaten, harass and intimidate school employees in violation of School Board policy and Mississippi State Law". (Again, as stated in the written school-district policy, "[h]arassment, intimidation, or threatening other students and/or teachers" constitutes a severe disruption.)

Approximately two weeks later, on 24 February, Bell and his mother filed this action, claiming, *inter alia*, the school board, superintendent, and principal (again, the school board) violated his First Amendment right to free speech. On 2 March, Bell requested a preliminary injunction, seeking his immediate reinstatement to his high school, including the reinstatement of "all privileges to which he was and may be entitled as if no disciplinary action had been imposed", and all references to the incident being expunged from his school records.

At the 10 March hearing for the requested injunction, Bell presented four affidavits from students at his school concerning alleged misconduct by the coaches. (The affidavits, however, were not considered by the court.) In

addition, Bell, his mother, school-board attorney Floyd, and Franklin (offered as an expert in rap music) were called as witnesses by Bell; superintendent McNeece and Coaches R. and W., by the school district.

Bell testified about his making and disseminating the recording; the meaning behind certain statements in it; and the resulting events leading up to, and after, school officials disciplined him. Bell's mother testified about her recollection of the events leading up to the disciplinary-committee and school-board hearings. She testified the school principal never stated Bell was dangerous or threatening, and that Bell was told to stay in the school before suspending him.

Floyd testified about her recollection of the events before, during, and after the disciplinary-committee and school-board hearings. During her testimony, the court noted Bell's contention that the rap recording addressed a matter of public concern. Floyd discussed the school-district policy Bell violated: he threatened, harassed, and intimidated school employees; similarly, she testified that, at their respective hearings, the disciplinary committee and the school board discussed the possibility of disruption.

Over the school-district's objection, Franklin was permitted to testify as an expert. Characterizing the statements in Bell's recording as nothing more than "colorful language" used to entice listeners and reflective of the norm among young rap artists, Franklin testified that it gave him no cause for concern. On cross-examination, however, he testified: if an individual's name is used in a rap recording and precedes the words "[p]ut a pistol in your mouth and cap him", "it would definitely be cause for a conversation with the young man, absolutely".

The superintendent testified: she had attended the school-board meeting; there was a foreseeable danger of substantial disruption at the school

as a result of the rap recording; and, a written version of Bell's rap recording was presented to the school board, before it adopted the disciplinary-committee's recommendation for suspension and temporary placement in the alternative school.

Both coaches identified in the rap recording testified that it adversely affected their work at the school. Coach R. testified: subsequent to the publication of the recording, students began spending more time in the gym, despite teachers' telling them to remain in classrooms; and the recording affected him in the way he conducted himself around students, noting he would no longer work with female members of the track team, instead instructing males on the team on how to coach the females and then having the males do so. Coach W. testified he: interpreted the statements in the rap recording literally, after hearing it on a student's smartphone at school; was "scared", because "you never know in today's society . . . what somebody means, [or] how they mean it"; and would not allow the members of the school basketball team he coached to leave after games until he was in his vehicle.

After finding Bell's last day attending the alternative school would be the next day, 11 March, the district court ruled whether to grant injunctive relief was moot. Accordingly, the requested injunction was denied.

It does not appear that any discovery took place after the preliminary-injunction hearing. On 9 May, following a case-management conference, the magistrate judge entered an order stating: "it appears that there are no factual issues and that this case should be resolved by motions for summary judgment"; and the parties had 90 days to file those motions.

Therefore, approximately three months later, the school board filed its summary-judgment motion on 1 August; Bell and his mother, on 5 August. On 15 March 2012, the district court denied the Bells' motion and granted the

school board's.   In doing so, it concluded the rap recording constituted "harassment and intimidation of teachers and possible threats against teachers and threatened, harassed, and intimidated school employees". *Bell*, 859 F. Supp. 2d at 840 (internal quotation marks omitted).   The court also concluded the rap recording "in fact caused a material and/or substantial disruption at school and . . . it was reasonably foreseeable to school officials the song would cause such a disruption". *Id.*  Moreover, the court concluded, *inter alia*: (1) the superintendent and principal were entitled to qualified immunity in their individual capacities; and (2) Bell's mother could not show a violation of her Fourteenth Amendment rights (she claimed the school's disciplining Bell violated her right to make decisions regarding the custody and care of her son). *Id.* at 841–42.

On appeal, only the summary judgment against Bell's First Amendment claim was challenged.  A divided panel in December 2014 held, *inter alia*:  the school board violated Bell's First Amendment right by disciplining him based on the language in the rap recording.  *Bell v. Itawamba Cnty. Sch. Bd.*, 774 F.3d 280, 304–05 (5th Cir. 2014), *reh'g en banc granted & opinion vacated*, 782 F.3d 712 (5th Cir. 2015).  En-banc review was granted in February 2015.

## II.

Because the summary judgment against Bell's mother's Fourteenth Amendment claim and for the school officials' qualified-immunity claim was not contested on appeal, the only issue before our en-banc court is the summary judgment against Bell's First Amendment claim.  (The misconduct alleged by Bell against the two teachers is, of course, not at issue.)

A summary judgment is reviewed *de novo*, applying the same standard as did the district court.  *E.g., Feist v. La., Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 452 (5th Cir. 2013).  Summary judgment is proper when

"there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law". Fed. R. Civ. P. 56(a). "A genuine dispute of fact exists when evidence is sufficient for a reasonable jury to return a verdict for the non-moving party, and a fact is material if it might affect the outcome of the suit." *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (citations and quotation marks omitted).

In determining whether to grant summary judgment, the court, in its *de novo* review, views the evidence in the light most favorable to the nonmovant. *E.g.*, *Dameware Dev., L.L.C. v. Am. Gen. Life Ins. Co.*, 688 F.3d 203, 206–07 (5th Cir. 2012). Consistent with that, on cross-motions for summary judgment, "we review [*de novo*] each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party". *Cooley v. Hous. Auth. of Slidell*, 747 F.3d 295, 298 (5th Cir. 2014) (internal quotation marks omitted) (quoting *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001)).

The summary-judgment record at hand includes, *inter alia*: (1) the affidavits of four students regarding the coaches' alleged misconduct; (2) screenshots of Bell's Facebook page; (3) a transcription of the rap recording submitted by the school board; (4) a transcription of the recording submitted by Bell (stipulated version); (5) the letter from the superintendent to Bell's mother, informing the Bells of a hearing before the disciplinary committee; (6) the digital recording of the rap recording; (7) the first screenshot of Bell's Facebook "wall"; (8) the second screenshot of Bell's Facebook "wall"; (9) the recording of the disciplinary-committee hearing; (10) the minutes of that hearing, containing the recommended disciplinary action; (11) the school-board attorney's letter to Bell's mother, informing her of the disciplinary committee's findings and recommended discipline; (12) the school-board-hearing minutes;

No. 12-60264

(13) the school-district's discipline policy; (14) the school-board attorney's letter to Bell's mother informing her of the school-board's determination; and (15) the transcript of the preliminary-injunction hearing.

A.

Students *qua* students do not forfeit their First Amendment rights to freedom of speech and expression. *Tinker*, 393 U.S. at 506, 511 ("School officials do not possess absolute authority over their students . . . . In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views."). On the other hand, the First Amendment does not provide students absolute rights to such freedoms, and those rights must be tempered in the light of a school official's duty to, *inter alia*, "teach[] students the boundaries of socially appropriate behavior", *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986), and "protect those entrusted to their care", *Morse v. Frederick*, 551 U.S. 393, 408 (2007). As Justice Oliver Wendell Holmes, Jr., wrote nearly a century ago: "[T]he character of every act depends upon the circumstances in which it is done. The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic." *Schenck v. United States*, 249 U.S. 47, 52 (1919) (citation omitted). Therefore, because "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings", *Fraser*, 478 U.S. at 682, certain speech, which would be protected in other settings, might not be afforded First Amendment protection in the school setting.

Balancing these competing interests, *Tinker* provided in 1969 the standard for evaluating whether the First Amendment protects a student's speech. There, the Court considered the suspension of students for wearing black armbands in protest against the Vietnam War. *Tinker*, 393 U.S. at 505–

14

14. In holding the students' speech protected under the First Amendment, the Court, focusing primarily on the effect of that speech on the school community, held:  A student "may express his opinions . . . if he does so without materially and substantially interfer[ing] with the requirements of *appropriate discipline in the operation of the school and without colliding with the rights of others*". *Id.* at 513 (alteration in original) (emphasis added) (internal quotation marks omitted).  Put another way, "conduct by the student, *in class or out of it*, which for any reason . . . materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized . . . ". *Id.* (emphasis added).  Approximately three years after *Tinker*, our court held this standard can be satisfied either by showing a disruption has occurred, or by showing "demonstrable factors that would give rise to *any reasonable forecast* by the school administration of 'substantial and material' disruption". *Shanley v. Ne. Indep. Sch. Dist., Bexar Cnty., Tex.*, 462 F.2d 960, 974 (5th Cir. 1972) (emphasis added) (holding school's suspension of students for their off-campus distribution of "underground" newspaper violated *Tinker*).

Since *Tinker*, the Court has revisited student speech on several occasions, each time carving out narrow exceptions to the general *Tinker* standard based on certain characteristics, or content, of the speech.  *See, e.g., Morse*, 551 U.S. at 425 (Alito, J, concurring) (grave and unique threats to the physical safety of students, in particular, speech advocating illegal drug use); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) (school-sponsored speech); *Fraser*, 478 U.S. at 685 (lewd, vulgar, or indecent speech); *see also Morgan v. Swanson*, 659 F.3d 359, 374 (5th Cir. 2011) (en banc) (describing the Court's holdings as "expand[ing] the kinds of speech schools can regulate . . . . to several broad categories of student speech" (internal quotation marks omitted)).  In *Fraser*, the Court held the school board acted within its authority

when it disciplined a student for an "offensively lewd and indecent" speech delivered at a student assembly. 478 U.S. at 677–78, 685. In *Hazelwood*, the Court upheld a school's right to "exercis[e] editorial control over the style and content of student speech" in a school-sponsored newspaper when the student engages in "expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school" and the school officials' "actions are reasonably related to legitimate pedagogical concerns". 484 U.S. at 262, 271, 273.

And, most recently in *Morse*, the Court considered whether a school infringed a student's First Amendment right of free speech when it disciplined him for holding up a banner that stated "BONG HiTS 4 JESUS" at a school-sponsored event. 551 U.S. at 397–98. The Court, through Justice Alito's controlling concurrence (joined by Justice Kennedy), held a school may discipline a student for speech which poses a "grave and . . . unique threat to the physical safety of students", such as "advocating illegal drug use". *Id.* at 425. (Justice Alito limited his "join[ing] the opinion of the Court on the understanding that the opinion does not hold that the special characteristics of the public schools necessarily justify any other speech restrictions". *Id.* at 423.)

For these exceptions, schools are not required to prove the occurrence of an actual disruption or one that reasonably could have been forecast. Similarly, in *Ponce v. Socorro Independent School District*, our court extended the *Morse* exception to certain threats of school violence. 508 F.3d 765, 771–72 (5th Cir. 2007). In response to a diary brought to school containing "terroristic threat[s]" mirroring recent mass school shootings, the school suspended the student. *Id.* at 767. On appeal, our court upheld the suspension as constitutional, extending *Morse*'s exception to speech "bearing the stamp of

. . . mass, systematic school-shootings" based on the "[l]ack of forewarning and the frequent setting within schools [which] give mass shootings the unique indicia that the concurring opinion [in *Morse*] found compelling with respect to drug use". *Id.* at 771.

In challenging the summary judgment, Bell claims the school board violated his First Amendment free-speech rights by temporarily suspending him and placing him in an alternative school for the six weeks remaining in the grading period. In support, he contends: *Tinker* does not apply to off-campus speech, such as his rap recording; and, even if it does, *Tinker*'s "substantial disruption" test is not satisfied. For the reasons that follow, we hold: *Tinker* applies to the off-campus speech at issue; there is no genuine dispute of material fact precluding ruling, as a matter of law, that a school official reasonably could find Bell's rap recording threatened, harassed, and intimidated the two teachers; and a substantial disruption reasonably could have been forecast, as a matter of law.

1.

As our court explained in *Morgan v. Swanson*, student-speech claims are evaluated "in light of the special characteristics of the school environment, beginning by categorizing the student speech at issue". 659 F.3d at 375 (footnotes and internal quotation marks omitted). We must thus decide whether Bell's speech falls under *Tinker*, or one of the Court's above-described exceptions. *See, e.g., Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 214 (3d Cir. 2001) (employing a similar approach, noting "[s]peech falling outside of . . . categories [such as those in *Fraser* and *Hazelwood*] is subject to *Tinker*'s general rule").

The parties do not assert, and the record does not show, that the school board disciplined Bell based on the lewdness of his speech or its potential

No. 12-60264

perceived sponsorship by the school; therefore, *Fraser* and *Hazelwood* are not directly on point.  Bell's speech likewise does not advocate illegal drug use or portend a Columbine-like mass, systematic school-shooting.  And, as Justice Alito noted, when the type of violence threatened does not implicate "the special features of the school environment", *Tinker*'s "substantial disruption" standard is the appropriate vehicle for analyzing such claims.  *Morse*, 551 U.S. at 425 (citing *Tinker*, 393 U.S. at 508–09) ("[I]n most cases, *Tinker*'s 'substantial disruption' standard permits school officials to step in before actual violence erupts".).  Although threats against, and harassment and intimidation of, teachers certainly pose a "grave . . . threat to the physical safety" of members of the school community, *id.*, violence forecast by a student against a teacher does not reach the level of the above-described exceptions necessitating divergence from *Tinker*'s general rule.  We therefore analyze Bell's speech under *Tinker*.  *See Ponce*, 508 F.3d at 771–72 & n.2 ("[B]ecause [threats of violence against individual teachers] are relatively discrete in scope and directed at adults, [they] do not amount to the heightened level of harm that was the focus of both the majority opinion and Justice Alito's concurring opinion in *Morse*".); *see also Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 38 (2d Cir. 2007) (analyzing threats of violence to individual teachers under *Tinker*); *Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978, 982–83 (11th Cir. 2007) (same).

2.

In claiming *Tinker* does not apply to off-campus speech, Bell asserts: *Tinker* limits its holding to speech inside the "schoolhouse gate"; and each of the Court's subsequent decisions reinforces this understanding.

"Experience shows that schools can be places of special danger." *Morse*, 551 U.S. at 424 (Alito, J., concurring).  Over 45 years ago, when *Tinker* was

decided, the Internet, cellphones, smartphones, and digital social media did not exist. The advent of these technologies and their sweeping adoption by students present new and evolving challenges for school administrators, confounding previously delineated boundaries of permissible regulations. *See, e.g., Wynar v. Douglas Cnty. Sch. Dist.*, 728 F.3d 1062, 1064 (9th Cir. 2013) ("With the advent of the Internet and in the wake of school shootings at Columbine, Santee, Newtown and many others, school administrators face the daunting task of evaluating potential threats of violence and keeping their students safe without impinging on their constitutional rights."). Students now have the ability to disseminate instantaneously and communicate widely from any location via the Internet. These communications, which may reference events occurring, or to occur, at school, or be about members of the school community, can likewise be accessed anywhere, by anyone, at any time. Although, under other circumstances, such communications might be protected speech under the First Amendment, off-campus threats, harassment, and intimidation directed at teachers create a tension between a student's free-speech rights and a school official's duty to maintain discipline and protect the school community. These competing concerns, and differing standards applied to off-campus speech across circuits, as discussed *infra*, have drawn into question the scope of school officials' authority. *See Morse*, 551 U.S. at 418 (Thomas, J., concurring) (lamenting the Court's failure to "offer an explanation of when [*Tinker*] operates and when it does not", and noting: "I am afraid that our jurisprudence now says that students have a right to speak in schools except when they do not").

Greatly affecting this landscape is the recent rise in incidents of violence against school communities. *See LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 987 (9th Cir. 2001) ("[W]e live in a time when school violence is an unfortunate

reality that educators must confront on an all too frequent basis".). School administrators must be vigilant and take seriously any statements by students resembling threats of violence, *Ponce*, 508 F.3d at 771, as well as harassment and intimidation posted online and made away from campus. This now-tragically common violence increases the importance of clarifying the school's authority to react to potential threats before violence erupts. *See Morse*, 551 U.S. at 408 (pressing that dangerous speech, such as speech advocating drug use, is substantially different from the political speech at issue in *Tinker*, because it presents a "far more serious and palpable" danger than an "undifferentiated fear or apprehension of disturbance" or "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" (citation and internal quotation marks omitted)); *see also Ponce*, 508 F.3d at 772 ("School administrators must be permitted to react quickly and decisively to address a threat of physical violence . . . without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance.").

In the light of these competing interests and increasing concerns regarding school violence, it is necessary to establish the extent to which off-campus student speech may be restricted without offending the First Amendment. Our holding concerns the paramount need for school officials to be able to react quickly and efficiently to protect students and faculty from threats, intimidation, and harassment intentionally directed at the school community. *See, e.g., Morse*, 551 U.S. at 425 (Alito, J., concurring) ("[D]ue to the special features of the school environment, school officials must have greater authority to intervene before speech leads to violence."); *Lowery v. Euverard*, 497 F.3d 584, 596 (6th Cir. 2007) ("School officials have an

affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place.").

a.

Despite Bell's recognizing the wealth of precedent across numerous circuits contrary to his position, he asserts: *Tinker* does not apply to speech which originated, and was disseminated, off-campus, without the use of school resources.  Bell's position is untenable; it fails to account for evolving technological developments, and conflicts not only with our circuit's precedent, but with that of every other circuit to have decided this issue.

Since *Tinker* was decided in 1969, courts have been required to define its scope.  As discussed below, of the six circuits to have addressed whether *Tinker* applies to off-campus speech, five, *including our own*, have held it does.  (For the other of the six circuits (the third circuit), there is an intra-circuit split. *See Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 219–20 (3d Cir. 2011) (en banc) (Jordan, J., concurring) (discussing that *Tinker*'s applicability to off-campus speech remains unresolved in the third circuit); *see also J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 931 & n.8 (3d Cir. 2011) (en banc) (divided court assuming, without deciding, that the *Tinker* substantial-disruption test applies to online speech harassing a school administrator).) The remainder of the circuits (first, sixth, seventh, tenth, eleventh, D.C.) do not appear to have addressed this issue.

Although the Supreme Court has not expressly ruled on this issue, our court, 43 years ago, applied *Tinker* to analyze whether a school board's actions were constitutional in disciplining students based on their off-campus speech. *E.g., Shanley*, 462 F.2d at 970 ("When the *Burnside/Tinker* standards are applied to this case . . . ".); *see also Sullivan v. Hous. Indep. Sch. Dist.*, 475 F.2d 1071, 1072 (5th Cir. 1973) ("This case arises from the unauthorized

distribution of an underground newspaper *near a high school campus*, and presents the now-familiar clash between claims of First Amendment protection on the one hand and the interests of school boards in maintaining an atmosphere in the public schools conducive to learning, on the other." (emphasis added)); *Wisniewski*, 494 F.3d at 39 (interpreting *Sullivan* as applying *Tinker* to off-campus speech); *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 615 n.22, 619 n.40 (5th Cir. 2004) (same).

In *Shanley*, students distributed newspapers containing articles they authored "during out-of-school hours, and without using any materials or facilities owned or operated by the school system", "near but outside the school premises on the sidewalk of an adjoining street, separated from the school by a parking lot". 462 F.2d at 964. In concluding the students' speech was protected, our court ruled: "[T]he activity punished here does not even approach the 'material and substantial' disruption . . . either in fact or in reasonable forecast [and] [a]s a factual matter . . . there were no disturbances of any sort, on or off campus, related to the distribution of the [newspaper]". *Id.* at 970.

Further, as noted *supra*, four other circuits have held that, under certain circumstances, *Tinker* applies to speech which originated, and was disseminated, off-campus. *See, e.g., Wynar*, 728 F.3d at 1069; *D.J.M. ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754, 766–67 (8th Cir. 2011); *Kowalski v. Berkeley Cnty. Schs.*, 652 F.3d 565, 573–74 (4th Cir. 2011); *Doninger v. Niehoff*, 527 F.3d 41, 48–50 (2d Cir. 2008). Therefore, based on our court's precedent and guided by that of our sister circuits, *Tinker* applies to off-campus speech in certain situations.

b.

Therefore, the next question is under what circumstances may off-campus speech be restricted. Our court's precedent is less developed in this regard. For the reasons that follow, and in the light of the summary-judgment record, we need not adopt a specific rule: rather, Bell's admittedly intentionally directing at the school community his rap recording containing threats to, and harassment and intimidation of, two teachers permits *Tinker*'s application in this instance.

i.

In 1972 in *Shanley*, our court expressly declined to adopt a rule holding a school's attempt to regulate off-campus speech under *Tinker* was *per se* unconstitutional. 462 F.2d at 974. Our court explained: "[E]ach situation involving expression and discipline will create its own problems of reasonableness, and for that reason we do not endeavor here to erect any immovable rules, but only to sketch guidelines". *Id.* Likewise, in 1973 in *Sullivan*, our court considered *Tinker*, but did not address any parameters for its application to off-campus speech. 475 F.2d at 1076–77.

Our court's far more recent, 2004 opinion in *Porter*, however, provides valuable insight in this regard. There, the school expelled a student after his brother brought to school a sketchpad containing a two-year-old drawing of the school's being attacked by armed personnel. 393 F.3d at 611. The depiction, albeit violent in nature, "was completed [at] home, stored for two years, and *never intended* by [the creator of the drawing] to be brought to campus". *Id.* at 615 (emphasis added). After concluding *Tinker* applied to the school's regulations, our court held the speech was protected because the student never *intended* for the drawing to reach the school, describing its introduction to the school community as "accidental and unintentional". *Id.* at 618, 620 ("Because

23

[the student's] drawing was composed off-campus, displayed only to members of his own household, stored off-campus, and not purposefully taken by him to [school] or publicized in a way certain to result in its appearance at [school], we have found that the drawing is protected by the First Amendment".). Of importance for the issue at hand, and after describing precedent from our and other circuits' applying *Tinker* to off-campus speech, our court stated its holding was "not in conflict with this body of case law" regarding the First Amendment and off-campus student speech because the drawing's being "composed off-campus and remain[ing] off-campus for two years until it was *unintentionally* taken to school by his younger brother takes the present case outside the scope of these precedents". *Id.* at 615 n.22 (emphasis added).

*Porter* instructs that a speaker's intent matters when determining whether the off-campus speech being addressed is subject to *Tinker*. A speaker's intention that his speech reach the school community, buttressed by his actions in bringing about that consequence, supports applying *Tinker*'s school-speech standard to that speech.

In addition, those courts to have considered the circumstances under which *Tinker* applies to off-campus speech have advocated varied approaches. *E.g., Wynar*, 728 F.3d at 1069 (holding that, regardless of the location of the speech, "when faced with an identifiable threat of school violence [(threats communicated online via MySpace messages)], schools may take disciplinary action in response to off-campus speech that meets the requirements of *Tinker*"); *Snyder*, 650 F.3d at 940 (Smith, J., concurring) (noting that any standard adopted "cannot turn solely on where the speaker was sitting when the speech was originally uttered [because s]uch a standard would fail to accommodate the somewhat 'everywhere at once' nature of the [I]nternet", and advocating allowing schools to discipline off-campus speech "[r]egardless of its

place of origin" so long as that speech was "intentionally directed towards a school"); *Kowalski*, 652 F.3d at 573 (applying *Tinker* when a "sufficiently strong" nexus exists between the student's speech and the school's pedagogical interests "to justify the action taken by school officials in carrying out their role as the trustees of the student body's well-being"); *D.J.M.*, 647 F.3d at 766 (applying *Tinker* because "it was reasonably foreseeable that [the student's] threats about shooting specific students in school would be brought to the attention of school authorities and create a risk of substantial disruption within the school environment"); *Doninger*, 527 F.3d at 48 (holding *Tinker* applies to speech originating off-campus if it "would foreseeably create a risk of substantial disruption within the school environment, at least when it was similarly foreseeable that the off-campus expression might also reach campus" (internal quotation marks omitted)).

The pervasive and omnipresent nature of the Internet has obfuscated the on-campus/off-campus distinction advocated by Bell, "mak[ing] any effort to trace First Amendment boundaries along the physical boundaries of a school campus a recipe for serious problems in our public schools". *Layshock*, 650 F.3d at 220–21 (Jordan, J., concurring). Accordingly, in the light of our court's precedent, we hold *Tinker* governs our analysis, as in this instance, when a student intentionally directs at the school community speech reasonably understood by school officials to threaten, harass, and intimidate a teacher, even when such speech originated, and was disseminated, off-campus without the use of school resources.

This holding is consistent with our circuit's precedent in *Shanley* and *Sullivan*, that of our sister circuits, and our reasoning in *Porter*. Further, in holding *Tinker* applies to the off-campus speech in this instance, because such determinations are heavily influenced by the facts in each matter, we decline:

to adopt any rigid standard in this instance; or to adopt or reject approaches advocated by other circuits.

ii.

Turning to the matter before us, there is no genuine dispute of material fact that Bell intended his rap recording to reach the school community. He admitted during the disciplinary-committee hearing that one of the purposes for producing the recording was to "increase awareness of the [alleged misconduct]" and that, by posting the rap recording on Facebook and YouTube, he knew people were "gonna listen to it, somebody's gonna listen to it", remarking that "students all have Facebook". In short, Bell produced and disseminated the rap recording knowing students, and hoping administrators, would listen to it.

Further, regardless of whether Bell's statements in the rap recording qualify as "true threats", as discussed in part II.B., they constitute threats, harassment, and intimidation, as a layperson would understand the terms. The Oxford English Dictionary defines: "threaten" as "to declare (usually conditionally) one's intention of inflicting injury upon" another, 17 Oxford English Dictionary 998 (2d ed. 1989); "harass" as "[t]o wear *out*, tire *out*, or exhaust with fatigue, care, [or] trouble", 6 *id.* at 1100 (emphasis in original); and "intimidate" as "[t]o render timid, inspire with fear; [or] to force to or deter from some action by threats or violence", 8 *id.* at 7–8. *See also* Black's Law Dictionary 1708 (10th ed. 2014) (defining "threat" as "[a] communicated intent to inflict harm or loss on another or on another's property"); *id.* at 831 (defining "harassment" as "[w]ords, conduct, or action . . . that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress to that person and serves no legitimate purpose"); *Elonis v. United States*, 135 S. Ct. 2001, 2011–12 (2015) (explaining that a "threat" can have different

definitions based on context (for example, the difference between its use in criminal statutes and its being protected speech under the First Amendment)).

A reasonable understanding of Bell's statements satisfies these definitions; they:  threatened violence against the two coaches, describing the injury to be inflicted (putting the pistol down their mouths and pulling the trigger, and "capping" them), described the specific weapon (a "rueger" [sic], which, as discussed *supra*, is a type of firearm), and encouraged others to engage in this action; and harassed and intimidated the coaches by forecasting the aforementioned violence, warning them to "watch [their] back[s]" and that they would "get no mercy" when such actions were taken.  Accordingly, as further discussed *infra*, there is no genuine dispute of material fact that Bell threatened, harassed, and intimidated the coaches by intentionally directing his rap recording at the school community, thereby subjecting his speech to *Tinker*.

3.

Having held *Tinker* applies in this instance, the next question is whether Bell's recording either caused an actual disruption or reasonably could be forecast to cause one.  Taking the school board's decision into account, and the deference we must accord it, *see, e.g., Wood v. Strickland*, 420 U.S. 308, 326 (1975), *overruled in part on other grounds, Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Shanley*, 462 F.2d at 975; *Callahan v. Price*, 505 F.2d 83, 87 (5th Cir. 1974), this question becomes whether a genuine dispute of material fact exists regarding the reasonableness of finding Bell's rap recording threatening, harassing, and intimidating; and, if no genuine dispute precludes that finding, whether such language, as a matter of law, reasonably could have been forecast to cause a substantial disruption.

No. 12-60264

a.

As noted by our court in *Shanley*, "in deference to the judgment of the school boards, we refer ad hoc resolution of . . . issues [such as this one] to the neutral corner of 'reasonableness'". 462 F.2d at 971; *see also id.* at 975 ("[T]he balancing of expression and discipline is an exercise in judgment for school administrations and school boards, subject only to the constitutional requirement of reasonableness under the circumstances".). For the reasons discussed *supra*, there is no genuine dispute of material fact that the school board's finding the rap recording threatened, harassed, and intimidated the two coaches was objectively reasonable.

b.

Next, we consider whether the school board's disciplinary action against Bell, based on its finding he threatened, harassed, and intimidated two coaches, satisfies *Tinker*. Arguably, a student's threatening, harassing, and intimidating a teacher inherently portends a substantial disruption, making feasible a *per se* rule in that regard. We need not decide that question because, in the light of this summary-judgment record, and for the reasons that follow, Bell's conduct reasonably could have been forecast to cause a substantial disruption.

i.

As discussed *supra*, *Tinker* allows a school board to discipline a student for speech that either causes a substantial disruption or reasonably is forecast to cause one. 393 U.S. at 514. The *Tinker* test is satisfied when: an actual disruption occurs; or the record contains facts "which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities". *Id.*

"*Tinker* requires a specific and significant fear of disruption, not just some remote apprehension of disturbance." *Saxe*, 240 F.3d at 211. "School officials must be able to show that their actions were caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 221 (5th Cir. 2009) (alterations and internal quotation marks omitted). "Officials must base their decisions on fact, not intuition", *id.* at 221–22 (internal quotation marks omitted); and those decisions are entitled to deference, *Shanley*, 462 F.2d at 967 ("That courts should not interfere with the day-to-day operations of schools is a platitudinous but eminently sound maxim which this court has reaffirmed on many occasions."). *See also Wood*, 420 U.S. at 326 ("It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion.").

As our court has held: "While school officials must offer facts to support their proscription of student speech, *this is not a difficult burden, and their decisions will govern if they are within the range where reasonable minds will differ*". *Cash*, 585 F.3d at 222 (emphasis added) (internal citations and quotation marks omitted). Accordingly, school authorities are not required expressly to forecast a "substantial or material disruption"; rather, courts determine the possibility of a reasonable forecast based on the facts in the record. *See, e.g., id.* at 217, 222; *see also Tinker*, 393 U.S. at 514 ("[T]he record does not demonstrate any facts which *might reasonably have led* school authorities to forecast substantial disruption of or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred". (emphasis added)).

Factors considered by other courts in determining, pursuant to *Tinker*, the substantiality *vel non* of an actual disruption, and the objective reasonableness *vel non* of a forecasted substantial disruption, include: the nature and content of the speech, the objective and subjective seriousness of the speech, and the severity of the possible consequences should the speaker take action, *e.g., Wynar*, 728 F.3d at 1070–71; the relationship of the speech to the school, the intent of the speaker to disseminate, or keep private, the speech, and the nature, and severity, of the school's response in disciplining the student, *e.g., Doninger*, 527 F.3d at 50–52; whether the speaker expressly identified an educator or student by name or reference, and past incidents arising out of similar speech, *e.g., Kowalski*, 652 F.3d at 574; the manner in which the speech reached the school community, *e.g., Boim*, 494 F.3d at 985; the intent of the school in disciplining the student, *Snyder*, 650 F.3d at 926, 929 (majority opinion), 951 (Fisher, J., dissenting); and the occurrence of other in-school disturbances, including administrative disturbances involving the speaker, such as "[s]chool officials ha[ving] to spend considerable time dealing with these concerns and ensuring that appropriate safety measures were in place", *D.J.M.*, 647 F.3d at 766, brought about "because of the need to manage" concerns over the speech, *Doninger*, 527 F.3d at 51.

ii.

Applying this precedent to the summary-judgment record at hand, and for the reasons that follow, a substantial disruption reasonably could have been forecast as a matter of law. Viewing the evidence in the requisite light most favorable to Bell, including his assertions that he wanted only to raise awareness of alleged misconduct by two teachers (Bell admitted at the disciplinary-committee hearing that his recording was meant to "increase awareness of the situation" and that he was "*foreshadowing something that*

*might happen*" (emphasis added)), the manner in which he voiced his concern—with threatening, intimidating, and harassing language—must be taken seriously by school officials, and reasonably could be forecast by them to cause a substantial disruption.

The speech pertained directly to events occurring at school, identified the two teachers by name, and was understood by one to threaten his safety and by neutral, third parties as threatening.  (Bell agreed at the disciplinary-committee hearing that "certain statements" were made to his mother "outside the school setting" that "'put a pistol down your mouth'[,] that is a direct threat".)  The possible consequences were grave—serious injury to, including the possible death of, two teachers.  Along that line, Bell admitted he intended the speech to be public and to reach members of the school community, which is further evidenced by his posting the recording to Facebook and YouTube.

As noted, the school district's Discipline – Administrative Policy lists "[h]arassment, intimidation, or threatening other students and/or teachers" as a severe disruption.  Although we may not rely on *ipse dixit* in evaluating the school board's actions, *Shanley*, 462 F.2d at 970, the school-district's policy demonstrates an awareness of *Tinker*'s substantial-disruption standard, and the policy's violation can be used as evidence supporting the reasonable forecast of a future substantial disruption.  *See, e.g., Morse*, 551 U.S. at 408–10 (relying on, *inter alia*, the student's violation of established school policy in holding the school board did not violate the student's First Amendment right); *Fraser*, 478 U.S. at 678, 686 (noting that the "[t]he school disciplinary rule proscribing 'obscene' language and the prespeech admonitions of teachers gave adequate warning to [the student] that his lewd speech could subject him to sanctions").

Further, even after finding Bell threatened, intimidated, and harassed two teachers, the school board's response was measured—temporarily suspending Bell and placing him in an alternative-education program for the remainder of the nine-week grading term (about six weeks). The reasonableness of, and amount of care given to, this decision is reinforced by the school board's finding, differently from the disciplinary committee's, that Bell's statements also constituted threats.

And finally, numerous, recent examples of school violence exist in which students have signaled potential violence through speech, writings, or actions, and then carried out violence against school communities, after school administrators and parents failed to properly identify warning signs. *See, e.g.,* Report of the Virginia Tech Review Panel, Mass Shootings at Virginia Tech April 16, 2007, 52 (August 2007), *available at* https://governor.virginia.gov/media/3772/fullreport.pdf (section entitled "Missing the Red Flags"); *see also Ponce*, 508 F.3d at 771 ("[T]he difficulty of identifying warning signs in the various instances of school shootings across the country is intrinsic to the harm itself".); *LaVine*, 257 F.3d at 987 ("After Columbine, Thurston, Santee and other school shootings, questions have been asked how teachers or administrators could have missed telltale 'warning signs,' why something was not done earlier and what should be done to prevent such tragedies from happening again.").

In determining objective reasonableness *vel non* for forecasting a substantial disruption, the summary-judgment record and numerous related factors must be considered against the backdrop of the mission of schools: to educate. It goes without saying that a teacher, which includes a coach, is the cornerstone of education. Without teaching, there can be little, if any, learning.

Without learning, there can be little, if any, education.  Without education, there can be little, if any, civilization.

It equally goes without saying that threatening, harassing, and intimidating a teacher impedes, if not destroys, the ability to teach; it impedes, if not destroys, the ability to educate.  It disrupts, if not destroys, the discipline necessary for an environment in which education can take place.  In addition, it encourages and incites other students to engage in similar disruptive conduct.  Moreover, it can even cause a teacher to leave that profession.  In sum, it disrupts, if not destroys, the very mission for which schools exist—to educate.

If there is to be education, such conduct cannot be permitted.  In that regard, the real tragedy in this instance is that a high-school student thought he could, with impunity, direct speech at the school community which threatens, harasses, and intimidates teachers and, as a result, objected to being disciplined.

Put succinctly, "with near-constant student access to social networking sites on and off campus, when offensive and malicious speech is directed at school officials and disseminated online to the student body, it is reasonable to anticipate an impact on the classroom environment". *Snyder*, 650 F.3d at 951–52 (Fisher, J., dissenting).  As stated, the school board reasonably could have forecast a substantial disruption at school, based on the threatening, intimidating, and harassing language in Bell's rap recording.

B.

In considering Bell's First Amendment claim, and our having affirmed summary judgment for the school board under *Tinker*, it is unnecessary to decide whether Bell's speech also constitutes a "true threat" under *Watts v. United States*, 394 U.S. 705 (1969) (holding hyperbolic threats on the

No. 12-60264

President's life are not "true threats"). *See Elonis*, 135 S. Ct. at 2012 (declining to address the First Amendment question (whether the speech was a "true threat" not protected by that amendment) after resolving the case on other grounds).

III.

For the foregoing reasons, the judgment is AFFIRMED.

E. GRADY JOLLY, specially concurring:

In determining the contours of constitutionally permissible school discipline, older cases are relevant for block building, but only block building, as we decide what speech schools may discipline under the First Amendment. In *Tinker*, there was no threat to kill a teacher, no threat of violence, and no lewd or slanderous comments regarding a teacher. *Tinker* also did not address the intersection between on-campus speech and off-campus speech. When *Tinker* refers to a disruption, it is saying that student ideas may be expressed on campus unless they are so controversial that the expression creates a disruption. Those principles are controlling where the facts fit, but *Tinker's* admonitions—or the admonitions in various precedents—are not equally forceful in every case. The same can be said of *Morse*. It is perhaps more applicable here than *Tinker*, because it speaks in terms of physical and moral danger to students. *Morse* makes clear that such danger does not require proof of disruptive effects that the speech may cause, as would be required in the case of mere expression of non-lethal statements.

It is true that in a footnote in *Ponce* we indicated that individual threats of violence are more appropriately analyzed in the light of *Tinker* as opposed to threats of mass violence, which we analyzed under *Morse*. These are evolving principles, however, and we now have before us a different case from *Tinker*, *Morse*, *Ponce*, or *Porter*. *Tinker* may well be a relevant precedent here. But that does not mean that all aspects of a political speech case must be slavishly applied to a case of threats to kill teachers.

We should apply reasonable common sense in deciding these continually arising school speech and discipline cases, as we would in any case dealing with the evolving common law, which takes into account the technological and societal environs of the times. When *Tinker* was written in 1969, the use of

35

the Internet as a medium for student speech was not within the Court's mind. It is also true that this issue was not in the forefront of the Court's mind when *Porter* was written in 2004, or even when *Morse* and *Ponce* were written. Ever since *Morse*, the use, the extent and the effect of the online speech seem to have multiplied geometrically.

Judges should also view student speech in the further context of public education today—at a time when many schools suffer from poor performance, when disciplinary problems are at their highest, and when schools are, in many ways, at their most ineffective point. Judges should take into account the effect the courts have had on these problems in school discipline. Increasing judicial oversight of schools has created unforeseen consequences, for teachers and for schools as much as for students. Students feel constraints on conduct and personal speech to be more and more permissive. Teachers will decide not to discipline students, given the likelihood of protracted litigation and its pressures on the time and person of those who work hard to keep up with the increasing demands placed on them as teachers. Schools will not take on the risk of huge litigation costs when they could use these resources on school lunches, textbooks, or other necessary school resources to educate children, all of which are sorely lacking in so many, many instances.

Judges can help to address these concerns by speaking clearly, succinctly and unequivocally. I would decide this case in the simplest way, consonant with our cases and the cases in other circuits, by saying as little as possible and holding:

> **Student speech is unprotected by the First Amendment and is subject to school discipline when that speech contains an actual threat to kill or physically harm personnel and/or students of the school; which actual**

No. 12-60264

**threat is connected to the school environment; and which actual threat is communicated to the school, or its students, or its personnel.**

With these comments, I join Judge Barksdale's opinion.

JENNIFER WALKER ELROD, Circuit Judge, joined by JONES, Circuit Judge, concurring:

I fully concur in the careful, well-reasoned majority opinion, because Bell's rap was directed to the school and contained threats of physical violence. *See Wynar v. Douglas Cnty. Sch. Dist.*, 728 F.3d 1062, 1069 (9th Cir. 2013) (declining to consider threshold tests from other circuits and holding only that schools may discipline off-campus student speech under the *Tinker* standard "when faced with an identifiable threat of school violence"); *see also Morse v. Frederick*, 551 U.S. 393, 424 (2007) (Alito, J., concurring) (remarking that "any argument for altering the usual free speech rules in the public schools . . . must . . . be based on some special characteristic of the school setting," and recognizing only one such special characteristic: "threat[s] to the physical safety of students"); *Ponce v. Socorro Ind. Sch. Dist.*, 508 F.3d 765, 770–72 (5th Cir. 2007) (interpreting *Morse* to allow punishment of off-campus speech threatening a mass shooting).

Most importantly, nothing in the majority opinion makes *Tinker* applicable off campus to non-threatening political or religious speech, even though some school administrators might consider such speech offensive, harassing, or disruptive. *See Morse*, 551 U.S. at 403, 409 (majority opinion) (noting that the student speech in *Morse* did not "convey[] any sort of political or religious message" and recognizing that while "much political and religious speech might be perceived as offensive to some," such speech "is at the core of what the First Amendment is designed to protect") (internal quotation marks omitted); *id.* at 422–23, 424 (Alito, J., concurring) (emphasizing the First Amendment's protection of speech that comments on political or social issues and observing that "[i]t is . . . wrong to treat public school officials, for purposes

relevant to the First Amendment, as if they were private, nongovernmental actors standing *in loco parentis*").

Indeed, as Judge D. Brooks Smith has cautioned, because *Tinker* allows the suppression of student speech (even political speech) based on its consequences rather than its content, broad off-campus application of *Tinker* "would create a precedent with ominous implications. Doing so would empower schools to regulate students' expressive activity no matter where it takes place, when it occurs, or what subject matter it involves—so long as it causes a substantial disruption at school." *See J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 939 (3d Cir. 2011) (en banc) (Smith, J., concurring) (five-judge concurrence opining that *Tinker* does not apply off campus). I agree with my learned colleague on the Third Circuit that the First Amendment does not, for example, allow a public school to punish a student for "writ[ing] a blog entry defending gay marriage" from his home computer, even if the blog entry causes a substantial disruption at the school. *Id.* (Smith, J., concurring).

By my read, the majority opinion avoids such "ominous implications" and does not subject a broad swath of off-campus student expression to *Tinker*. Rather, it quite sensibly decides only the case before it, applying *Tinker* to Bell's rap, which was intentionally directed toward the school and contained threats of physical violence. Because this cautious approach does not place public school officials *in loco parentis* or confer upon them a broad power to discipline non-threatening off-campus speech, I concur in full.

No. 12-60264

GREGG COSTA, Circuit Judge, joined by OWEN and HIGGINSON, Circuit Judges, concurring:

This case involves two serious problems that arise all too frequently in today's classrooms: violence and sexual harassment.  Judge Dennis's dissent points out that the harassment of female students is a matter of vital public concern that Bell's song sought to expose.  The problem for Bell is that his song—with its graphic discussion of violence against the coaches—goes well beyond blowing the whistle on the alleged harassment.

Judge Dennis's dissent contends that these whistleblowing aspects of the song nonetheless entitle the speech to "special protection" under the First Amendment.  Dissent at 1, 12.  It treats this argument as a separate basis for ruling in Bell's favor.  But fitting this case within *Snyder v. Phelps*, public employee speech cases like *Pickering*, and the litany of other cited cases assumes that *Tinker* is not implicated.  *Tinker*, of course, involved speech on not just a matter of public concern, but *the* public concern of its day—the war in Vietnam.  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 504 (1969).  Yet the Court still balanced the value of that speech against its impact on the learning environment.  *See id.* at 509.  That disruption analysis may well have come out differently had the Tinkers combined their armband protest with talk of violence.  Identifying some aspect of Bell's song that addresses a matter of public concern therefore is not enough to elevate it above the *Tinker* framework unless *Tinker* does not apply to this type of off-campus speech (in which case the speech would enjoy First Amendment protection from school discipline so long as it constitutes any form of protected speech, not just the "highest rung").

Whichever First Amendment doctrine one tries to latch onto, the inescapable question is thus whether *Tinker*'s balancing approach governs "off-

campus" student speech that is directed at the school community. For the reasons discussed in the majority opinion, along with the views expressed by every other circuit that has taken a position on this issue, I agree that it does, at least when the speech is threatening, harassing, and intimidating as it is here.

Broader questions raised by off-campus speech will be left for another day. That day is coming soon, however, and this court or the higher one will need to provide clear guidance for students, teachers, and school administrators that balances students' First Amendment rights that *Tinker* rightly recognized with the vital need to foster a school environment conducive to learning. That task will not be easy in light of the pervasive use of social media among students and the disruptive effect on learning that such speech can have when it is directed at fellow students and educators. Indeed, although Judge Dennis's dissent extols the aspects of Bell's song that sought to combat sexual harassment, the blanket rule it advocates—one that would deprive schools of any authority to discipline students for off-campus speech published on social media no matter how much it disrupts the learning environment—would allow sexual harassment and ferocious cyberbullying that affect our classrooms to go unchecked. *See Morrow v. Balaski*, 719 F.3d 160, 164 (3d Cir. 2013) (describing multiple cyberbullying incidents in which students were threatened by phone and on MySpace by another student); *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 773 (8th Cir. 2012) (explaining that students' posts on a blog they created "contained a variety of offensive and racist comments as well as sexually explicit and degrading comments about particular female classmates, whom they identified by name"); *Kowalski v. Berkeley Cnty. Sch.*, 652 F.3d 565, 568 (4th Cir. 2011) (detailing online bullying incident in which high school students created

41

webpage called "Students Against Shay's Herpes" in reference to another high school student).

With these additional observations, I join the majority opinion.

JAMES L. DENNIS, Circuit Judge, with whom GRAVES, Circuit Judge, joins in full, and with whom PRADO, Circuit Judge, joins except as to Parts I and II. B., dissenting:

Although mischaracterizing itself as "narrow" in scope, the *en banc* majority opinion broadly proclaims that a public school board is constitutionally empowered to punish a student whistleblower for his purely off-campus Internet speech publicizing a matter of public concern. As if to enforce the adage that "children should be seen and not heard," the majority opinion holds that the Itawamba County School Board did not violate the First Amendment when it suspended high school senior Taylor Bell for composing and posting a rap song on the Internet using his home computer during non-school hours, which criticized two male teachers for their repeated sexual harassment of minor female students. In my view, the majority opinion commits serious constitutional and summary-judgment procedural errors because: (1) Bell is entitled to summary judgment because his off-campus rap song was specially protected speech on a matter of public concern; (2) the School Board was not authorized by *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), to censor students' off-campus online speech; and (3) even assuming *arguendo* that *Tinker* granted the School Board power to censor such speech, the School Board was not entitled to summary judgment under *Tinker*, because the evidence, viewed in the light favorable to the non-movant, Bell, does not support the conclusion that Bell's speech caused a substantial disruption of school activities or justified a reasonable forecast of such a disruption by school officials. The majority opinion thereby denigrates and undermines not only Bell's First Amendment right to engage in off-campus online criticism on matters of public concern but also the rights of untold numbers of other public school students in our

jurisdiction to scrutinize the world around them and likewise express their off-campus online criticism on matters of public concern.  In doing so, the majority opinion obliterates the historically significant distinction between the household and the schoolyard by permitting a school policy to supplant parental authority over the propriety of a child's expressive activities on the Internet outside of school, expanding schools' censorial authority from the campus and the teacher's classroom to the home and the child's bedroom.

As detailed herein, the majority opinion commits a number of fundamental errors that necessitate highlighting lest readers be misinformed by its version of the relevant facts and law.  *First and foremost*, the majority opinion erroneously fails to acknowledge that Bell's rap song constitutes speech on "a matter of public concern" and therefore "occupies the highest rung of the hierarchy of First Amendment values." *See Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (internal quotation marks and citation omitted).  Instead, by narrowly focusing its analysis on a few, plainly rhetorical lyrics in Bell's song, the majority opinion wholly glosses over the urgent social issue that Bell's song lays bare and thus flouts Supreme Court precedent requiring us to evaluate whether "the overall thrust and dominant theme of [Bell's song] spoke to broader public issues"—which it did. *See id*. at 454.

*Second,* in drastically expanding the scope of schools' authority to regulate students' off-campus speech, the majority opinion disregards Supreme Court precedent establishing that minors are entitled to "significant" First Amendment protection, including the right to engage in speech about violence or depicting violence, and that the government does not enjoy any "free-floating power to restrict the ideas to which children may be exposed." *See Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2735–36 (2011).  Similarly, the majority opinion also altogether fails to consider Supreme Court precedents

44

that substantially restrict the government's ability to regulate Internet speech, *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868–70 (1997), and the extent to which the majority opinion's vague framework fails to provide constitutionally adequate notice of when student speech crosses the line between permissible and punishable off-campus expression, *see id.* at 871–72; *accord Brown*, 131 S. Ct. at 2744–46 (Alito, J., concurring). Further, by deriving its rule from a school policy that focuses on whether a layperson might view Bell's speech as "threatening," "harassing," or "intimidating," the majority opinion ignores First Amendment precedents demanding that the government prove more than mere negligence before imposing penalties for so-called "threatening" speech. *See Virginia v. Black*, 538 U.S. 343, 359 (2003); *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 904, 928–29 (1982).

*Third*, by holding that the *Tinker* framework applies to off-campus speech like Bell's, the majority opinion simply ignores that *Tinker*'s holding and its *sui generis* "substantial-disruption" framework are expressly grounded in "the special characteristics of the school environment," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), and the need to defer to school officials' authority "to prescribe and control conduct *in the schools*," *id.* at 507 (emphasis added), whereas Bell's rap song was recorded and released entirely outside the school environment. The Court's post-*Tinker* precedents make clear this critical distinction. *See, e.g., Morse v. Frederick*, 551 U.S. 393, 422 (2007) (Alito, J., concurring) (noting that *Tinker* allows schools to regulate "in-school student speech . . . in a way that would not be constitutional in other settings"). In this regard, the majority opinion also fails to account for the vital fact that the *Tinker* framework is far too indeterminate of a standard to adequately protect the First Amendment right of students, like Bell, to engage in expressive activities outside of school, as well as their parents' constitutional

right to direct their children's upbringing and the First Amendment right of adults and children alike to receive students' speech.  In other words, the majority opinion allows schools to police their students' Internet expression anytime and anywhere—an unprecedented and unnecessary intrusion on students' rights.

*Fourth and finally*, the majority opinion also errs in its very application of the *Tinker* framework.  As detailed in the panel majority's opinion, the summary-judgment evidence simply does not support the conclusion, as required by *Tinker*, that Bell's song substantially disrupted school activities or that school officials reasonably could have forecasted that it would do so.  In reaching the opposite conclusion, the majority opinion not only fails to view the summary-judgment evidence in the light most favorable to the non-movant, Bell, *accord Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014), but also dilutes the *Tinker* "substantial-disruption" framework into an analytic nullity.

Even in the most repressive of dictatorships, the citizenry is "free" to praise their leaders and other people of power or to espouse views consonant with those of their leaders.  "Freedom of speech" is thus a hollow guarantee if it permits only praise or state-sponsored propaganda.  Freedom of speech exists exactly to protect those who would criticize, passionately and vociferously, the actions of persons in power.  But that freedom is denied to Bell by the majority opinion because the persons whose conduct he dared to criticize were school teachers.  If left uncorrected, the majority opinion inevitably will encourage school officials to silence student speakers, like Taylor Bell, solely because they disagree with the content and form of their speech, particularly when such off-campus speech criticizes school personnel.  Such a precedent thereby clearly contravenes the basic principle that, "[i]n our system, students may not be regarded as closed-circuit recipients of only that

No. 12-60264

which the States chooses to communicate. They may not be confined to expression of those sentiments that are officially approved." *Tinker*, 393 U.S. at 511. Today, however, the majority opinion exempts the children of Texas, Louisiana, and Mississippi from this long-established constitutional safeguard. Because the majority opinion's undue deference to a public school board's assertion of authority to censor the speech of students while not within its custody impinges the very core of our Constitution's fundamental right to free speech, I respectfully but emphatically dissent.

## I.

The *en banc* majority opinion completely ignores Bell's argument that the School Board violated his First Amendment rights in punishing him for his rap song, which he contends was protected speech on "a matter of public concern." Although Bell strenuously made his "speech on a matter of public concern" argument at every opportunity, including at the *en banc* oral argument, the *en banc* majority opinion fails to address this critical point. Instead, the majority opinion transforms the Itawamba County School Board disciplinary policy into an unprecedented rule of constitutional law that effectively permits school officials across our Circuit to punish a student's protest of teacher misconduct regardless of when or where the speech occurs and regardless of whether the student speaker is, at the time of the speech, an adult or a minor fully within the custody and control of his or her parents. I respectfully but strongly disagree with the majority opinion's silent rejection of Bell's argument, not only because Bell's argument is meritorious, but also because the opinion's *sub silentio* decision of the issue presented has led it into several serious and unfortunate constitutional errors.

Speech on "matters of public concern" is "at the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011)

47

(internal quotation marks and citation omitted). "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Id.* at 452 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "That is because 'speech concerning public affairs is more than self-expression; it is the essence of self-government.'" *Id.* (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964)). "Accordingly, 'speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.'" *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)).

Although the Supreme Court has noted that "the boundaries of the public concern test are not well defined," *San Diego v. Roe*, 543 U.S. 77, 83 (2004) (per curiam), it has "articulated some guiding principles, principles that accord broad protection to speech to ensure that courts themselves do not become inadvertent censors," *Snyder*, 562 U.S. at 452. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id.* at 453 (internal quotation marks and citations omitted). "The arguably 'inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.'" *Id.* (quoting *Rankin v. McPherson*, 483 U.S. 378, 387 (1987)).

Determining whether speech involves a matter of public concern "requires us to examine 'the content, form, and context' of th[e] speech, as revealed by the record as a whole." *Id.* (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985)). "As in other First Amendment cases, the court is obligated 'to make an independent examination of the whole record in order to make sure that the judgment does not constitute

a forbidden intrusion on the field of free expression.'" *Id.* (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984)). "In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Id.* at 454.

In *Snyder*, the Supreme Court applied this framework to hold that the First Amendment barred an aggrieved father from recovering for, *inter alia*, intentional infliction of emotional distress, against an anti-gay church congregation whose picketing coincided with the funeral of his son, who was a marine, notwithstanding the alleged outrageousness and hurtfulness of the picketers' speech to Snyder. [1] 562 U.S. at 460. Specifically, in that case, Fred Phelps, the founder of the Westboro Baptist Church, traveled to Maryland, along with six parishioners, in order to hold a protest on public property 1,000 feet from the funeral of Marine Lance Corporal Matthew Snyder, who was killed in Iraq in the line of duty. *Id.* at 448. The picketing was conducted under police supervision and out of the sight of those at the church. *Id.* at 457. The protest was not unruly; there was no shouting, profanity, or violence. *Id.* The record confirms that any distress occasioned by Westboro's picketing turned on the content and viewpoint of the message conveyed, rather than any interference with the funeral itself. *Id.* The picketers peacefully displayed signs that read "God Hates the USA/Thank God for 9/11," "America is Doomed," "Don't Pray for the USA," "Thank God for IEDs," "Thank God for Dead Soldiers," "Pope in Hell," "Priests Rape Boys," "God Hates Fags," "You're Going to Hell," and "God Hates You." *Id.* at 448. The Westboro picketers

---

[1] "The funeral procession passed within 200 to 300 feet of the picket site. Although Snyder testified that he could see the tops of the picket signs as he drove to the funeral, he did not see what was written on the signs until later that night, while watching a news broadcast covering the event." *Id.* at 449.

displayed these signs for about 30 minutes before the funeral began. *Id.* at 449.

Snyder's father thereafter filed a diversity action against Phelps and other picketers alleging, *inter alia*, state tort claims of intentional infliction of emotional distress, intrusion upon seclusion, and civil conspiracy. *Id.* at 449–50. After a jury awarded millions of dollars in damages, Phelps and his congregants argued that they were entitled to judgment as a matter of law because the First Amendment fully protected their speech. *Id.* at 450. The district court reduced the punitive damages award, but left the verdict otherwise intact. *Id.* The Fourth Circuit reversed, concluding that Westboro's statements were entitled to First Amendment protection because those statements "were on matters of public concern, were not provably false, and were expressed solely through hyperbolic rhetoric." *Id.* at 451.

The Supreme Court granted *certiorari* and affirmed. *Id.* at 461. Evaluating the "content, form and context" of the congregants' protest, the Court concluded that Westboro's speech addressed a matter of public concern and was entitled to "special protection" under the First Amendment, thus barring Snyder from recovering in tort on the basis of the "outrageousness" of their speech. *Id.* at 458. According to the Court:

> Such speech cannot be restricted simply because it is upsetting or arouses contempt. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Indeed, "the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995).

*Id.* Further, the Court concluded:

Westboro believes that America is morally flawed; many Americans might feel the same about Westboro. Westboro's funeral picketing is certainly hurtful and its contribution to public discourse may be negligible. But Westboro addressed matters of public import on public property, in a peaceful manner, in full compliance with the guidance of local officials. The speech was indeed planned to coincide with Matthew Snyder's funeral, but did not itself disrupt that funeral, and Westboro's choice to conduct its picketing at that time and place did not alter the nature of its speech.

Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and—as it did here—inflict great pain. On the facts before us, we cannot react to that pain by punishing the speaker. As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate. That choice requires that we shield Westboro from tort liability for its picketing in this case.

*Id.* at 460-461.

Applying these principles to the instant case, the record indisputably reveals that Bell's speech addressed a matter of public concern. Bell composed his song after a number of his female friends at school informed him that Coaches Wildmon and Rainey had frequently sexually harassed them during school. The lyrics of Bell's song[2] describe in detail the female students' allegations of sexual misconduct, *e.g.*, describing Coach Wildmon as "telling students that they [were] sexy," and Coach Rainey as "rubbing on the black girls' ears in the gym." With a darkly parodic—and, by many standards, crude—tone, the song ridicules the coaches for their outrageously inappropriate conduct with the female students, *e.g.*, describing one coach as having "drool running down [his] mouth" while he "look[s] down girls' shirts,"

---

[2] Bell's Facebook page labels the song "P.S. Koaches," but Bell's complaint identifies the song's title as "PSK The Truth Needs to be Told."

and positing that Wildmon is "fucking around" because of his wife's appearance (the song states that "his wife ain't got no titties").[3] By describing Rainey as "Bobby Hill the second," the song also draws parallels between the coaches' alleged sexual misconduct and the alleged sexual misconduct of a former Itawamba coach, Bobby Hill, who was arrested the previous year for sending sexually explicit text messages to a female student. Although the song does contain some violent lyrics, the song's overall "content" is indisputably a darkly sardonic but impassioned protest of two teachers' alleged sexual misconduct, *e.g.*, opining that Rainey is "a fool/30 years old fucking with students at the school." That Bell's song may fall short of the School Board's aesthetic preferences for socio-political commentary is not relevant to determining whether the rap song's content addresses a matter of public concern. *See, e.g., Snyder*, 562 U.S. at 453 (observing that "[t]he arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern") (internal quotation marks omitted). In *Snyder*, the Supreme Court explicitly rejected the argument that the crude and egregiously offensive messages on the anti-gay protesters' signs—which included "Fag Troops," "God Hates the USA/Thank God for 9/11" and "Thank God for Dead Soldiers"—should affect the inquiry into whether the signs addressed a matter of public concern. *Id.* at 454. According to the Court,

---

[3] Notably, the instances of sexual misconduct detailed in Bell's lyrics were not unsubstantiated. Four different female students submitted sworn affidavits detailing the sexual harassment they endured at the hands of the coaches. For instance, consistent with Bell's lyrics, one female student stated in her sworn affidavit that Rainey had rubbed her ears without her permission. Likewise, another female student claimed that Wildmon had looked down her shirt; told her that she "was one of the cutest black female students" at Itawamba; commented on her "big butt"; and told her that he "would date her if [she] were older." Another female student consistently stated that Rainey told her, "Damn, baby, you are sexy," while in the school gym. Another female student stated that Rainey told her that he would "turn" her "back straight from being gay."

"[w]hile these messages may fall short of refined social or political commentary, the issues they highlight . . . are matters of public import." *Id.* So much more so here where Bell addresses a serious issue of alleged teacher sexual misconduct toward minor students. Indeed, similar to *Snyder*, even if some of Bell's lyrics were crude and contained violent imagery, "th[is] would not change the fact that the overall thrust and dominant theme of [Bell's song] spoke to broader public issues." *See id.*

The "form" of Bell's speech, *i.e.*, a rap song, likewise militates in favor of finding that it addresses a matter of public concern. It is axiomatic that music, like other art forms, has historically functioned as a mechanism to raise awareness of contemporary social issues.[4] Rap is no exception. "Over the past twenty years there has been extensive academic discourse on the role of rap music . . . as a form of political expression." *Commonwealth v. Gray*, 463 Mass. 731, 755 n.24 (2012) (collecting authorities). A long aspiring rap artist himself,[5] Bell invoked this same tradition by deploying the artistic conventions and style of the rap genre in order to critique the coaches' sexual harassment of female students.

Finally, the "context" of Bell's speech likewise evinces that it addresses a matter of public import. By releasing his song on the Internet, Bell sought to bring attention to the coaches' sexual misconduct against his female classmates, just as the Westboro group in *Snyder* sought to bring attention to its protest by picketing in public. *See Snyder*, 562 U.S. at 454–55 (concluding that the "context" of "[the protesters'] signs, displayed on public land next to a

---

[4] *See, e.g.*, Bob Dylan, *The Times They Are A-Changin'*, on The Times They Are a Changin' (Columbia Records 1964) ("Come Senators, Congressmen, please heed the call. Don't stand in the doorway, don't block up the hall.").

[5] Bell's stage name is "T-Bizzle."

public street, reflect the fact that the church finds much to condemn in modern society"). In a monologue introduction on the YouTube version of his song, Bell described the genesis of the rap as follows:

> A lot of people been asking me lately you know what was my reasoning behind creating P.S. Koaches. It's . . . something that's been going on . . . for a long time [] that I just felt like I needed to address. I'm an artist . . . I speak real life experience. . . .

Later, at the Disciplinary Committee meeting, Bell likewise explained that the song was an effort to "speak out" on the issue of teacher-on-student sexual harassment.[6]

Although Bell was an enrolled high school student, he was not within the custody of the school system when he initially composed, recorded, and posted his rap song on the Internet during the Christmas holidays. At that time he was eighteen years old but living with his mother, and therefore was an adult capable of making his own decisions as to expressing his views publicly. Even if he had still been a minor at the time he composed and posted his song, he would have been subject to the exclusive control, custody, and discipline of his parent—not the school system. *See Shanley v. Ne. Indep. Sch. Dist.*, 462 F.2d 960, 964 (5th Cir. 1972). Because Bell's speech did not fall within any of the narrow unprotected categories of speech recognized by the Supreme Court (*e.g.*, obscenity or a true threat),[7] it was fully protected speech and presumptively

---

[6] Bell also explained that he did not immediately report the teachers' misconduct to school authorities because, in his view, school officials generally ignored complaints by students about the conduct of teachers.

[7] Although the School Board claims that Bell's speech constitutes a "true threat," this argument is without merit for the reasons explained in the panel majority opinion. *See Bell v. Itawamba Cnty. Sch. Bd.*, 774 F.3d 280, 300–03 (5th Cir. 2014) (explaining that Bell's song did not constitute a "true threat," "as evidenced by, *inter alia*, its public broadcast as a rap song, its conditional nature, and the reactions of its listeners"). In any event, as explained herein, the majority opinion does not conclude that Bell's song was a true threat. *See* Maj. Op. pp. 26, 33–34. Nor could it.

not subject to governmental regulation or censorship on the basis of its content. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975) ("Speech that is neither obscene as to youths nor subject to some other legitimate proscriptions cannot be suppressed solely to protect the young . . ."). Beyond that basic First Amendment protection, however, the content, form, and context of Bell's speech indisputably reveals that it was also entitled to "special protection" against censorship because it was speech on a matter of public concern safeguarded "at the heart" of the First Amendment's protections. *Snyder*, 562 U.S. at 451–52. Therefore, at a bare minimum, Bell was entitled to as much, if not more, First Amendment protection as tortfeasors and public employees when the state attempts to regulate their speech addressing matters of public concern. *See, e.g., Snyder*, 562 U.S. at 459–60 (holding that speakers on matters of public concern could not be held liable in tort for intentional infliction of emotional distress, intrusion upon seclusion, and civil conspiracy on the basis of their speech); *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 466–68 (1995) (explaining the restrictions upon the government to punish employees when they speak on matters of public concern); *Rankin*, 483 U.S. at 386–89 (holding that threatening statement by public employee addressed a matter of public concern and government could not terminate her on the basis of that speech). Moreover, while it is not dispositive of this case, it bears mentioning that the School Board has never attempted to argue that Bell's song stated any fact falsely.

The majority opinion, however, wholly ignores these critical aspects of Bell's speech,[8] instead reflexively reducing Bell's rap song to "intimidating,

---

[8] The majority opinion instead summarily concludes that the "misconduct alleged by Bell against the two teachers is, of course, not at issue." *See* Maj. Op. p. 13. Of course, I agree that the *veracity* of these allegations is not the "issue" in this case anymore than the

harassing, and threatening" speech without any analysis whatsoever. Indeed, under the majority opinion's newfound approach, Bell's off-campus speech is regulable by school officials pursuant to *Tinker* because (i) Bell wanted his speech to be heard by community members *and* (ii) "a layperson" apparently would view some of the lyrics in the rap as "threatening," "harassing," and "intimidating." As an initial matter, I am compelled to point out that the majority opinion's test unabashedly adopts almost the precise wording of the Itawamba County School Board's disciplinary policy. Unmoored from traditional constitutional law analysis, the majority opinion instead exalts this single school board's policy to a new rule of constitutional law. *See* Maj. Op. p. 25 (holding that *Tinker* applies where student's off-campus speech is threatening, harassing and intimidating).

Furthermore, *Snyder* itself squarely illumines the errors in the majority's two-prong test. Turning first to the majority opinion's flawed criticism of Bell's intention to publicize his message, the Supreme Court in *Snyder* explicitly held that a speaker's efforts to communicate his message to the public is a reason to provide his speech with *heightened* protection—not a reason to permit greater regulation by the state. 562 U.S. at 454–55 (concluding that protesters' decision to conduct their protest "on public land next to a public street" evinced that the speech addressed a matter of public concern). Yet, in direct contradiction to *Snyder*, the majority opinion's proffered framework perversely *faults* Bell for his efforts to publicize the teachers' sexual misconduct, thus creating precedent that contravenes the very

---

veracity of Westboro's signs was the "issue" in *Snyder*. What is at issue, however, is whether publicly protesting that alleged misconduct warrants "special protection" for Bell's speech. The answer to that question, as explained above, is yes. In any event, however, Bell has offered uncontroverted proof of the coaches' sexual harassment of the minor female students in the form of sworn affidavits detailing that abuse, which were introduced into evidence in this case.

values that the First Amendment seeks to protect. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988) ("At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern.").

In addition, contrary to the majority opinion's focus on how a "layperson" apparently would perceive Bell's speech, the Supreme Court's cases, including *Snyder*, demonstrate that listeners' subjective opinions about speech cannot control whether speech addresses a matter of public concern or not. For example, in *Snyder*, the Court explained that "[t]he arguably 'inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.'" 562 U.S. at 453. (quoting *Rankin*, 483 U.S. at 387). Specifically, in *Snyder*, a layperson likewise might have viewed the anti-gay protesters' messages as harassing ("God Hates You"), intimidating ("You're Going to Hell"), and threatening ("Thank God for Dead Soldiers," "Thank God for IEDs"), but the Court nevertheless held that "the overall thrust and dominant theme of Westboro's demonstration spoke to broader public issues" entitling it to "special protection." *Id.* at 454. Thus, the "special protection" that must be afforded to Bell's speech here cannot be qualified by the majority opinion's mere conjecture that some hypothetical "layperson" *might* consider a few of Bell's lyrics to fit the Oxford English Dictionary's definition of "threatening," "harassing" or "intimidating." *See id.* Indeed, there is no constitutional basis for excluding "threatening," "harassing," or "intimidating" speech from the "special protection" that is afforded speech on matters of public concern. The majority opinion's approach is thus tantamount to permitting mainstream sensitivities to define whether speech addresses a matter of public concern or not. *Snyder* clearly demonstrates that approach is flawed. *Id.* at 453; *see also Cohen v. California*, 403 U.S. 15, 21 (1971)

(recognizing that the First Amendment does not permit "a majority to silence dissidents simply as a matter of personal predilections").

In sum, by refusing to recognize that Bell's speech addresses a matter of public concern and is thereby entitled to "special protection" against censorship, the majority opinion creates a precedent that effectively inoculates school officials against off-campus criticism by students.   In so doing, the majority opinion fails to take seriously the long-established principle that the First Amendment was adopted to protect "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Sullivan*, 376 U.S. at 270; *cf. City of Houston v. Hill*, 482 U.S. 451, 465 (1987) (holding that the First Amendment does not permit states to "provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them").   Contrary to the majority opinion's position, school officials are no exception.  *See West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) ("The Fourteenth Amendment . . . protects the citizen against the State itself and all of its creatures—Boards of Education not excepted."); *Shanley*, 462 F.2d at  964 ("It should have come as a shock to the parents of five high school seniors . . . that their elected school board had assumed suzerainty over their children before and after school, off school grounds, and with regard to their children's rights of expressing their thoughts.  We trust that it will come as no shock whatsoever to the school board that their assumption of authority is an unconstitutional usurpation of the First Amendment.").

## II.

The *en banc* majority opinion affirms the School Board's punishment of Bell pursuant to its new and unprecedented rule of constitutional law whereby schools may punish students' off-campus speech pursuant to *Tinker* if that

speech is intentionally directed at the school community and is "threatening, harassing, and intimidating" to the ears of a "layperson" without any instruction on the meaning of these terms. The majority opinion's content-based, vague, and "layperson"-based restriction directly conflicts with the core principles underlying the First Amendment's guarantees as explained by the Supreme Court.

**A.**

"The First Amendment provides that 'Congress shall make no law . . . abridging the freedom of speech.'" *United States v. Stevens*, 559 U.S. 460, 468 (2010). As a general matter, the First Amendment prohibits the government from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002). "From 1791 to the present, however, the First Amendment has permitted restrictions upon the content of speech in a few limited areas, and has never included a freedom to disregard these traditional limitations." *Stevens*, 559 U.S. at 468. "These limited areas—such as obscenity, incitement, and fighting words—represent well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any constitutional problem." *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011) (internal quotation marks and citations omitted).

In *Brown*, the Supreme Court specifically rejected the argument that state officials retain a broad "free-floating power" to create whole new categories of unprotected speech that are applicable solely to minors, even if such speech is deemed harmful in the eyes of the government. *Id.* at 2735–36. In that case, the Court struck down as violative of the First Amendment a California law that prohibited the sale or rental of violent video games to minors. *Id.* at 2732-33. Specifically, the law proscribed the sale or rental to

minors of video "games 'in which the range of options available to a player includes killing, maiming, dismembering, or sexually assaulting an image of a human being, if those acts are depicted' in a manner that '[a] reasonable person, considering the game as a whole, would find appeals to a deviant or morbid interest of minors,' that is 'patently offensive to prevailing standards in the community as to what is suitable for minors,' and that 'causes the game, as a whole, to lack serious literary, artistic, political, or scientific value for minors.'" *Id.* (quoting Cal. Civ. Code. Ann. § 1746(d)(1)(A)). California purportedly enacted the law based on its legislative judgment, which it claimed was supported by research, that such games were harmful to children. *Id.* at 2738-39. In defending the law, California argued, *inter alia*, that the First Amendment permitted it "to create a wholly new category of content-based regulation that is permitted only for speech directed at children"—*viz.*, "violent" speech as defined above that lacked "serious literary, artistic, political, or scientific value for minors." *Id.* at 2733–35.

In a strongly worded opinion by Justice Scalia, the Supreme Court rejected California's arguments and struck down the law. Concluding that its recent decision in *United States v. Stevens*, 559 U.S. 460 (2010),[9] controlled the

---

[9] In *Stevens*, the United States government had attempted to leverage similar arguments in defending a federal statute banning depictions of animal cruelty. 559 U.S. at 468-69. The United States argued that "depictions of animal cruelty" should be added to the list of categories of unprotected speech, alongside obscenity, incitement, and defamation. *Id.* However, because there was no "tradition excluding *depictions* of animal cruelty from 'the freedom of speech' codified in the First Amendment," the Court refused to create a new category of unprotected speech for such depictions. *Id.* The Court also explicitly rejected "as startling and dangerous" the government's contention that it could create new categories of unprotected speech by applying a "simple balancing test" that weighs the value of a particular type of speech against its social costs. *Id.* at 470. According to the Court,

[t]he First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the

outcome of the case, the Court held that California could not defend its law by analogizing the violent speech at issue to the obscenity exception to the First Amendment because its prior "cases have been clear that the obscenity exception . . . does not cover whatever a legislature finds shocking, but only depictions of sexual conduct." *Id.* at 2734. More critically, however, the Court outright rejected California's argument that the First Amendment permitted the state "to create a wholly new category of content-based regulation," *i.e.,* speech containing violent imagery, "that is permissible only for speech directed at children." *Id.* at 2735. Although acknowledging that the state "possesses legitimate power to protect children from harm," the Court concluded that such power "does not include a free-floating power to restrict the ideas to which children may be exposed." *Id.* at 2736. Further, while noting that California's argument would "fare better if there were a longstanding tradition in this country of specially restricting children's access to depictions of violence," the Court observed that there was no such tradition, as evidenced by the extent of violence contained in common children's stories (*e.g.,* Hansel and Gretel) and high school reading lists (*e.g.,* the description in "Lord of the Flies" of a schoolboy who is savagely murdered by other children). *Id.* at 2736. Accordingly, as in *Stevens*, because there was no "longstanding tradition" of prohibiting minors' participation in speech containing violent imagery, the Court refused to hold that such speech is categorically exempted from First Amendment protection. *Id.* at 2736-38.

---

cost. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it.

*Id.* A subsequent, much more narrow version of the statute at issue in *Stevens*, was upheld by our court. *United States v. Richards*, 755 F.3d 269, 271, 279 (5th Cir. 2014) (discussing history of 18 U.S.C. § 48 and upholding version that proscribed only "unprotected obscenity"), *cert. denied*, 135 S. Ct. 1546 (2015).

Applying these principles to the instant case, *Brown* represents a forceful reaffirmation by the Court that the First Amendment applies to minors,[10] *id.* at 2735, and that the government may only restrict that constitutional right in "narrow and well-defined circumstances," *id.* at 2736 (citing *Erznoznik*, 422 U.S. at 212–13). Indeed, after *Brown*, it cannot seriously be contested that minors enjoy the First Amendment right to engage in speech containing violent imagery when they are at home, away from school, so long as that speech does not rise to the level of a true threat, incitement or fighting words. *See id.* at 2736-38 (holding that speech containing violent imagery is protected under the First Amendment, even for minors). Nevertheless, the majority opinion wholly fails to reckon with these important statements by the Court. Instead, by simply assuming that all children speak "*qua* students," its legal analysis begins with the false premise that the speech at issue constitutes "student speech" that must be "tempered in the light of a school official's duty" to teach students appropriate behavior. *See* Maj. Op. p. 14 (discussing the First Amendment rights of "[s]tudents *qua* students"). But the Supreme Court has never suggested that minors' constitutional rights *outside of school* are somehow qualified if they coincidentally are enrolled in a public school. To the contrary, *Brown* evinces that the majority opinion instead should have begun

---

[10] In so holding, the Court also explicitly rejected Justice Thomas' contention in his dissent that minors have no right to speak absent their parents' consent. *Id*. at 2736 n.3 (noting that Justice Thomas "cites no case, state or federal, supporting this view, and to our knowledge there is none"). Although conceding that the government may have authority to enforce parental prohibitions in certain circumstances (*e.g.,* forcing concert promoters not to admit minors whose parents have forbidden them from attending), the Court nevertheless observed that "it does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*. The latter would mean, for example, that it could be made criminal to admit persons under 18 to a political rally without their parents' prior written consent—even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors." *Id*. (emphasis in original).

its analysis from the basic premise that children are entitled to "significant" First Amendment rights. 131 S. Ct. at 2735–36.

Further, *Brown* and *Stevens* illuminate the error in the majority opinion's decision to proclaim an entirely new, content-based restriction on students' First Amendment rights. Although acknowledging that the government has certain powers to protect children from harm, the Supreme Court in *Brown* expressly held that this "does not include a free-floating power to restrict the ideas to which children may be exposed." 131 S. Ct. at 2736. In so holding, the Court echoed the principles announced in *Stevens* and rejected the argument that the state is empowered to carve out new "categorical exemptions" to the First Amendment's protections (*e.g.*, obscenity) that are solely applicable to minors absent a "longstanding tradition" of restricting such speech. *Id.* In direct contradiction to these principles, however, the majority opinion here affords state officials with precisely such a "free-floating power" by effectively permitting them to regulate an unprecedented and content-based category of speech, *i.e.,* "threatening," "harassing," and "intimidating" speech that is directed at the school community. Yet, the majority opinion cites no "longstanding tradition" in this country of "specially restricting" children's ability to engage off campus in "threatening," "harassing," or "intimidating" speech. Nor could it. *See id.* ("California's argument would fare better if there were a longstanding tradition in this country of specially restricting children's access to depictions of violence, but there is none."); *Stevens*, 559 U.S. at 469 ("But we are unaware of any similar tradition excluding *depictions* of animal cruelty from 'the freedom of speech' codified in the First Amendment, and the Government points us to none."). To the extent the majority opinion posits this

63

category of speech is without redeeming social value[11] or that its risks outweigh its costs, the Supreme Court has flatly rejected such a rationale for carving out new categories of unprotected speech. *See Stevens*, 559 U.S. at 470 ("The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits."). In this connection, the Court in *Brown* likewise held that majoritarian abhorrence for a category of speech (*i.e.,* violent speech) will not justify a categorical restriction upon that type of speech. *See Brown*, 131 S. Ct. at 2733 ("Under our Constitution, esthetic and moral judgments about art and literature . . . are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority." (internal quotation marks and citation omitted)). Moreover, contrary to the majority opinion's approach, the Supreme Court in both *Brown* and *Stevens* emphasized that the "historic and traditional categories" of unprotected speech (*e.g.,* fighting words, obscenity) are "well defined and narrowly limited." *See Brown*, 131 S. Ct. at 2733; *Stevens*, 559 U.S. at 468-69. Here, far from announcing a "narrow" or "well defined" restriction on speech, the majority opinion simply declares that schools may regulate off-campus student speech that its invented layperson might consider "threatening," "harassing," or "intimidating." As detailed below, the breadth of these content-based restrictions will leave students to speak at their own peril away from school, because school officials will be unconstrained due to the majority opinion's failure to provide any specific or determinate definition of "threatening," "harassing," or "intimidating."

---

[11] However, as explained above, Bell's speech clearly had "social value" as it constituted speech on a matter of public concern.

No. 12-60264

**B.**

The Court's opinion in *Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997), further reveals the flaws in the majority opinion's holding that schools may regulate students' off-campus online speech, like Bell's. *Reno* was the first significant First Amendment case specifically pertaining to the Internet to reach the Supreme Court, and concerned a facial challenge to a congressional statute, the Communications Decency Act of 1996 ("CDA"), which was aimed at protecting minors from "indecent" and "patently offensive" material on the Internet by prohibiting the transmission of those materials to minors. 521 U.S. at 858-59. In striking down the CDA as violative of the First Amendment, the Court articulated a number of principles that are directly pertinent to the instant case.

First, *Reno* reveals that the majority opinion here is in error in concluding that the advent of the Internet and other technologies necessitates expanding schools' authority to regulate students' off-campus speech. *See* Maj. Op. p. 19. In direct contradiction to the majority opinion's logic, the Court in *Reno* held that Supreme Court precedents "provide no basis for qualifying the level of First Amendment scrutiny that should be applied to [the Internet]." *Id.* at 870. Although the Court previously had recognized that special factors justify greater regulation of speech expressed in *broadcast* media, *see, e.g., FCC v. Pacifica Foundation*, 438 U.S. 726 (1978), the Court explicitly found that "[t]hose factors are not present in cyberspace." *Reno*, 521 U.S. at 868.[12]

---

[12] The Court in *Brown* echoed this principle in observing that government should not be afforded greater deference to restrict speech when new communication technologies emerge. 131 S. Ct. at 2733 ("[W]hatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears.") (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)); *accord Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 326 (2010) ("Courts, too, are bound by the

Nevertheless, the majority opinion overlooks these unequivocal statements by the Supreme Court. *See, e.g.,* Maj. Op. p. 19 (concluding that "[t]he advent of [the Internet and other] technologies and their sweeping adoption by students present new and evolving challenges for school administrators, confounding previously delineated boundaries of permissible regulations").

In addition, the Court's analysis in *Reno* reveals how the majority opinion's ill-devised framework for regulating minors' off-campus Internet speech would be too vague altogether for the First Amendment to tolerate. The Court in *Reno* took special issue with the vagueness of the terms that the CDA utilized to describe the proscribed speech. *Id.* at 871. For example, the Court emphasized that the statute did not define either "indecent" material or material that "in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs." *Id.* As the Court observed, "[g]iven the absence of a definition of either term, this difference in language will provoke uncertainty among speakers about how the two standards relate to each other and just what they mean. Could a speaker confidently assume that a serious discussion about birth control practices, homosexuality, the First Amendment issues raised by the Appendix to our *Pacifica* opinion, or the consequences of prison rape would not violate the CDA?" *Id.*

Similar vagueness concerns drove Justice Alito to conclude that the California "violent video game" regulation in *Brown* violated the Constitution. *Brown*, 131 S. Ct. at 2743-46 (Alito, J., joined by Roberts, C.J., concurring in the judgment). As Justice Alito observed, one of the elements defining the

---

First Amendment. We must decline to draw, and then redraw, constitutional lines based on the particular media or technology used to disseminate political speech from a particular speaker.").

proscribed violent video games was whether a "reasonable person, considering [a] game as a whole," would find that it "appeals to a *deviant* or *morbid* interest of minors." *Id*. at 2745. However, as Justice Alito observed, the "prevalence of violent depictions in children's literature and entertainment creates numerous opportunities for reasonable people to disagree about which depictions may excite 'deviant' or 'morbid' impulses." *Id*. at 2746.

Here, the *en banc* majority opinion similarly announces a new, categorical restriction upon students' off-campus speech that fails to "give people of ordinary intelligence fair notice of what is prohibited." *See id*. at 2743. Specifically, the majority opinion holds that school officials may punish students' off-campus speech when (i) it is intended to be heard by the school community; (ii) could be perceived by a layperson as "threatening," harassing," and "intimidating,"; and (iii) satisfies the *Tinker* "substantial-disruption" framework. *See* Maj. Op. pp. 25–26. As with the statute struck down in *Reno*, however, each one of these three prongs to the majority opinion's framework contains defects that fail to provide students, like Bell, with adequate notice of when their off-campus speech crosses the critical line between protected and punishable expression. *First*, the majority opinion's focus on whether the student "intended" his speech to reach the school community significantly burdens the ability of students to engage in online speech, because virtually any speech on the Internet can reach members of the school community. *See Reno*, 521 U.S. at 870 (observing that the Internet permits "any person . . . [to] become a town crier with a voice that resonates farther than it could from any soapbox"). How, then, can a student be certain that his off-campus blog posting will not be read by members of the school community and thereby be deemed by school officials to be "intentionally direct[ed] at the school community"? As a result of the ambiguities in the majority opinion's framework, he simply

67

cannot.  *See id.* ("Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer.").

*Second*, the majority opinion's "threatening, harassing, and intimidating" test suffers from the precise same ambiguities that drove the Court to strike down the CDA in *Reno*.  As with the CDA, the majority opinion fails to provide any meaningful definition of what constitutes "threatening," "harassing," or "intimidating" speech.  Rather, the majority opinion merely concludes that if a "layperson would understand"[13] speech to qualify as "threatening," "harassing," and "intimidating," then that speech is regulable under *Tinker*.  In so holding, the majority opinion fails to apprehend that reasonable minds may differ about when speech qualifies as "threatening," harassing," or "intimidating."  As the Supreme Court's First Amendment precedents make clear, "it is . . . often true that one man's vulgarity is another's lyric," *Cohen v. California*, 403 U.S. 15, 25 (1971), and that the very same words may simultaneously be perceived as repulsive to some and political to others, *see Snyder*, 562 U.S. at 444–45 ("Westboro may have chosen the picket location to increase publicity for its views, and its speech may have been particularly hurtful to Snyder.  That does not mean that its speech should be afforded less than full First Amendment protection under the circumstances of

---

[13] Unfortunately, the majority opinion provides virtually no details about the identity of its apocryphal layperson.   In any event, I am dubious that a school board may punish students for making statements at home and on the Internet that the most sensitive of listeners in society would find to be "threatening," "harassing," or "intimidating."  *See Ashcroft*, 542 U.S. at 674 (Stevens, J. concurring) ("I continue to believe that the Government may not penalize speakers for making available to the general World Wide Web audience that which the least tolerant communities in America deem unfit for their children's consumption.").  Nevertheless, by permitting school officials to punish off-campus speech like Bell's pursuant to *Tinker*, the majority opinion announces a precedent whereby the First Amendment rights of minors outside of school are "only . . . as strong as the weakest, or at least the most thin-skinned, listener in a crowd." *Cuff ex re. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 120 (2d Cir. 2012) (Pooler, J., dissenting).

this case."). Thus, "[g]iven the vague contours of the coverage of the [majority opinion's framework], it [will] unquestionably silence[] some speakers whose messages would be entitled to constitutional protection." *Reno*, 521 U.S. at 874.

*Third*, the aforementioned concerns are exacerbated by the fact that the *Tinker* standard itself could be viewed as somewhat vague.[14]   *Tinker* permits schools to regulate on-campus expressive activities *not only* when the speech, in fact, causes a substantial disruption, *but also* when school officials can "reasonably forecast" such a disruption, *Tinker*, 393 U.S. at 514.   If this standard were applied off campus, how can a student or a student's parents know with any degree of certainty when off-campus online speech can be "forecasted" to cause a "substantial disruption"?   Although *Tinker* is not a completely toothless standard, *see A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 221 (5th Cir. 2009), its framework inherently requires guesswork about how a third-party school official will prophesize over the effect of speech.   Thus, in light of the majority opinion, before a student drafts an email or writes a blog entry, he hereinafter will be required to conjecture over whether his online speech *might* cause a "disruption" that is "substantial" in the eyes of school officials, or, alternatively, whether a school official *might* reasonably portend that a substantial disruption *might* happen.   In this way, the majority opinion erroneously defines the contours of protected speech with reference to the potential reactions of listeners.   *See Beckerman v. City of Tupelo*, 664 F.2d 502, 509 (5th Cir. 1981) (observing that the Supreme Court's cases concerning the "hecklers' veto" show that it "is not acceptable for the state to prevent a speaker

---

[14] As explained below, this framework makes sense for student speech occurring on campus, where school officials have competing interests in maintaining conduct in the schools.   However, this standard is inappropriate where, as here, the school's interest is comparatively attenuated.

from exercising his constitutional rights because of the reaction to him by others").

What will be the direct consequence of these various layers of vagueness upon students' First Amendment freedoms?  "[I]t will operate[] to chill or suppress the exercise of those freedoms by reason of vague terms or overbroad coverage."  *See Nevada Comm'n on Ethics v. Carrigan*, 131 S. Ct. 2343, 2353 (2011) (Kennedy, J. concurring).  Indeed, for students, whose performance at school largely determines their fate in the future, even the specter of punishment will likely deter them from engaging in off-campus expression that could be deemed controversial or hurtful to school officials.  *Accord Reno*, 521 U.S. at 871–72 ("The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech.").  Such a burden on student's expressive activities simply cannot be reconciled with the long-established principle that "the point of all speech protection . . . is to shield [from censorship] just those choices of content that in someone's eyes are misguided, or even hurtful."  *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995).

## C.

Further, by adopting a rule that focuses on whether a "layperson" would perceive Bell's speech as "threatening," "harassing," and "intimidating," the majority opinion also ignores Supreme Court case law that demands a more burdensome showing upon the government before levying penalties upon a speaker based on the content of his speech.

Amongst the most consistent principles of First Amendment jurisprudence has been the need for "[e]xacting proof requirements" before imposing liability for speech.  *See Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 620 (2003).  For example, the Supreme Court

70

has explicitly rejected arguments permitting tort liability to be imposed for speech pertaining to public figures simply because it "is patently offensive and is intended to inflict emotional injury." *Falwell*, 485 U.S. at 50.  Rather, in order to "give adequate 'breathing space' to the freedoms protected by the First Amendment," the Court has held that a public figure must prove not only falsity but also actual malice.  *Id.* at 56.  Similarly, in the criminal context, "mens rea requirements . . . provide 'breathing room' for more valuable speech by reducing an honest speaker's fear that he may accidentally incur liability for speaking." *United States v. Alvarez*, 132 S. Ct. 2537, 2553 (2012) (Breyer, J., concurring in the judgment).  Thus, in *Brandenburg v. Ohio*, 395 U.S. 444 (1969), the Supreme Court reversed the conviction of a Ku Klux Klan leader for threatening "revengeance" if the "suppression" of the white race continued, relying on "the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation *except where* such advocacy *is directed* to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 447 (emphasis added); *see also Noto v. United States*, 367 U.S. 290, 297–98 (1961) ("[T]he mere abstract teaching of . . . the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action."). Subsequently, the Court applied *Brandenberg*'s focus on the "intent" of the speaker to hold that a speaker may not be held liable for damages in a civil case even when his remarks "*might have been understood* . . . as intending to create a fear of violence." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 904, 927 (1982) (emphasis added).

Applying these well-established First Amendment principles, the Supreme Court in *Virginia v. Black*, 538 U.S. 343 (2003), struck down a

71

No. 12-60264

Virginia statute that criminalized burning a cross in public "with the intent of intimidating any person," and which provided that the public burning of a cross "shall be prima facie evidence of an intent to intimidate." *Id.* at 347–48. Although cross burning is "widely viewed as a signal of impending terror," *id.* at 391 (Thomas, J., concurring), "in light of [its] long and pernicious history as a signal of impending violence," *id.* at 363 (opinion of O'Connor, J.), a plurality of the Court held that a subjective intent requirement was necessary in order to distinguish "constitutionally proscribable intimidation" from "core political speech," *id.* at 365–66. "Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons *with the intent* of placing the victim in fear of bodily harm or death." *Id.* at 360 (emphasis added). As the plurality explained, the prima facie evidence provision of the statute was facially unconstitutional because it "ignore[d] all the contextual factors that are necessary to decide whether a particular cross burning was intended to intimidate. The First Amendment does not permit such a short cut." *Id.* at 367. In other words, the prima facie evidence provision "strip[ped] away the very reason a state may ban cross burning with the intent to intimidate." *Id.* at 365.

Recently, in *Elonis v. United States*, 135 S. Ct. 2001 (2015), the Supreme Court was presented with the opportunity to revisit its reasoning in *Virginia v. Black* and clarify whether or not the First Amendment requires a speaker to have a "subjective intent" to threaten an individual before the government can impose criminal penalties for a threat. *Id.* at 2004 ("The question is whether [18 U.S.C. § 875(c)] . . . requires that the defendant be aware of the threatening nature of the communication, and—if not—whether the First Amendment requires such a showing."). The Court, however, avoided this constitutional question by deciding the case on narrower grounds, *viz.*, that a jury instruction

explaining that petitioner could be convicted upon a showing of negligence was inconsistent with the statute's implicit *mens rea* requirement.  *Id.* at 2012 ("The jury was instructed that the Government need only prove that a reasonable person would regard Elonis's communications as threats, and that was error.  . . . Given our disposition, it is not necessary to consider any First Amendment issues.").  Specifically, the Court outright rejected the government's contention that the statute permitted petitioner to be convicted if he (i) knew the "contents and context" of his speech and (ii) "a reasonable person would have recognized that the [speech] would be read as genuine threats."  *Id.* at 2011.  While recognizing that such a "'reasonable person' standard is a familiar feature of civil liability in tort law," the Court concluded that the standard is "inconsistent with the conventional requirement for criminal conduct—*awareness* of some wrong doing."  *Id.* (internal quotation marks omitted).

Applying the foregoing principles to the instant case, the majority opinion errs by making the scope of Bell's First Amendment rights outside of school contingent upon whether a "layperson" might interpret his speech to be "threatening," "harassing," and "intimidating," *see* Maj. Op. pp. 26–27, and whether a school official might "reasonably" forecast a substantial disruption based on his speech, *see* Maj. Op. pp. 30–31.  The majority opinion's test effectively amounts to the very kind of negligence standard that the Supreme Court has rejected for determining whether a speaker may be held liable on the basis of his words.  *See, e.g., Claiborne Hardware Co.*, 458 U.S. at 928–29; *Brandenburg*, 395 U.S. at 447.  Further, by permitting Bell to be punished solely on the basis that a third-party might consider his speech "intimidating" or "threatening," the majority opinion ignores the Court's explanation in *Black* that "[i]ntimidation in the constitutionally proscribable sense of the word is a

73

type of true threat, where a speaker directs a threat to a person or group of persons *with the intent* of placing the victim in fear of bodily harm or death." 538 U.S. at 360 (emphasis added). Instead, perhaps conceding *sub silentio* that Bell's speech does not satisfy the demanding "true threat" standard described in *Black*, the majority opinion circumvents this issue altogether by creating an entirely new and diluted test that renders speech unprotected so long as its invented layperson might view the speech as "intimidating," "harassing," and "threatening," despite the fact that such speech does not constitute a "true threat." *See Bell v. Itawamba Cnty. Sch. Bd.*, 774 F.3d 280, 300–03 (5th Cir. 2014) (explaining that Bell's song did not constitute a "true threat," "as evidenced by, *inter alia,* its public broadcast as a rap song, its conditional nature, and the reactions of its listeners"). Moreover, the majority opinion's approach is especially problematic in light of the critical fact that Bell's speech addresses a matter of public concern. In cases involving speech addressing public figures and matters of public import, the Court has consistently applied a stricter evidentiary burden before permitting liability to be imposed on a speaker on the basis of his speech. *See, e.g., Falwell*, 485 U.S. at 56 (holding that "public figures and public officials" must prove "actual malice" in addition to falsity before recovering for intentional infliction of emotional distress on the basis of speech directed at them); *Sullivan*, 376 U.S. at 279–80 (holding that the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'"). Here, in sharp contrast, the majority opinion announces a constitutional rule whereby students, like Bell, may be held liable for their off-campus speech that criticizes official misconduct based largely on the reactions of the very officials in question or the perception of the majority opinion's invented "layperson." Such a flimsy standard simply

74

cannot be squared with the foregoing First Amendment precedents. *See also Pacifica Foundation*, 438 U.S. at 745–46 ("[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection.").

## III.

In ultimately holding that the *Tinker* framework applies to off-campus speech like Bell's, the majority opinion ignores that *Tinker*'s holding and its *sui generis* "substantial-disruption" framework are expressly grounded in "the special characteristics of the school environment." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). In *Tinker*, the Court confronted the question whether school officials may, consistent with the First Amendment, restrict students' expressive activities that occur at school. *Id.* Specifically, the students in *Tinker* were suspended for wearing to school armbands that expressed their opposition to the Vietnam War. *Id.* at 504. While recognizing that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *id.* at 506, the Court also observed that students' exercise of their First Amendment rights at school must be calibrated against the competing need of school officials "to prescribe and control conduct *in the schools*," *id.* at 507 (emphasis added). To reconcile the interests at stake that may collide when student speech occurs on campus, the Court articulated a rule that has become the lodestar for evaluating the scope of students' on-campus First Amendment rights ever since: while on campus, a student is free to "express his opinions, even on controversial subjects, if he does so without 'materially and substantially interfer(ing) with the requirements of appropriate discipline in the operation of the school' and without colliding with

the rights of others." *Id.* at 513 (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)).

The Supreme Court's holding in *Tinker* is expressly based upon the "special characteristics of the school environment," *id.* at 506, and the need to defer to school officials' authority "to prescribe and control conduct in the schools," *id.* at 507. Indeed, the very analytic content of the resulting "substantial-disruption" framework evinces that the Court was solely concerned with the potentially disruptive consequences of speech by students that occurs on campus, where school officials and fellow students may be directly affected. *See, e.g., id.* at 514 ("[The students] neither interrupted school activities nor sought to intrude in the school affairs or the lives of others. They caused discussion outside of the classrooms, but no interference with work and no disorder."). Moreover, the Court's later school-speech cases emphasize that the *Tinker* framework is limited to speech occurring within the school environment. For example, according to the Court's decision in *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986), *Tinker* rests on the premise that "the constitutional rights of students *in public schools* are not automatically coextensive with the rights of adults in other settings." *Id.* at 682 (emphasis added); *see also id.* at 688 n.1 (Brennan J., concurring in judgment) (stating that the Court's student-speech precedents "obviously do not [apply] outside of the school environment" and also observing that if the plaintiff in *Fraser* "had given the speech [for which he was punished] outside of the school environment, he could not have been penalized simply because [school] officials considered his language to be inappropriate"). Subsequently, in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), the Court described its decision in *Tinker* as "address[ing] educators' ability to silence a student's personal expression that happens *to occur on the school premises*."

*Id.* at 271 (emphasis added); *see also id.* at 266 (observing that schools may regulate some on-campus speech "even though the government could not censor similar speech outside the school").

Most recently, in *Morse*, Justice Alito's controlling concurrence observed that *Tinker* allows school officials to regulate "in-school student speech . . . in a way that would not be constitutional in other settings." 551 U.S. at 422 (Alito, J. concurring). Justice Alito further emphasized the historically significant distinction between on-campus and off-campus expression by comparing the unique harms of speech that occurs within the schoolyard as opposed to outside of school: "School attendance can expose students to threats to their physical safety that they would not otherwise face. Outside of school, parents can attempt to protect their children in many ways and may take steps to monitor and exercise control over the persons with whom their children associate." *Id.* at 424 (Alito, J. concurring). In this regard, Justice Alito also rejected the contention that school officials "stand in the shoes of the students' parents," explaining that "[i]t is a dangerous fiction to pretend that parents simply delegate their authority—including their authority to determine what their children may say and hear—to public school authorities." *Id.* Further, Justice Alito observed that he joined the majority opinion on the understanding that the Court's holding does not justify "any other speech restriction" based on the "special characteristics" of the school environment beyond those already recognized in the Court's prior student-speech cases. *Id.* at 423. Indeed, in narrowly limiting the reach of the Court's holding, Justice Alito characterized school officials' regulation of the student-speech at issue in that case[15] as

---

[15] In *Morse*, the Court held that the First Amendment did not prevent school officials from punishing a student who unfurled at a school-sanctioned event a banner that reasonably could be perceived as promoting illegal drug use. 551 U.S. at 396. Notably, the majority opinion in this case overstates *Morse*'s narrow holding by describing that holding as

"standing at the far reaches of what the First Amendment permits." *Id.* at 425. As the foregoing demonstrates, *Morse* and the Court's other post-*Tinker* precedents make crystal clear what the majority opinion and some of our sister circuits' decisions[16] fail to follow: *Tinker* does not authorize school officials to regulate student speech that occurs off campus and not at a school-sponsored event, where the potential "collision" of interest upon which *Tinker*'s holding pivots simply is not present.

Further, even assuming *arguendo*, without deciding, schools possess some authority to regulate students' off-campus speech under certain circumstances, the majority opinion errs in deeming the *Tinker* framework as the appropriate standard to delineate the scope of that authority. In reaching this conclusion, the majority opinion's logic is flawed from the very start. The majority opinion oddly begins its analysis by citing our opinion in *Morgan v. Swanson*, 659 F.3d 359 (5th Cir. 2011) (en banc), for the proposition that the threshold task facing the *en banc* court is "categorizing the student speech at issue." *Id.* at 375. Without ever mentioning that *Morgan* was a case involving

extending to "*grave and unique threats to the physical safety of students*, in particular speech advocating illegal drug use." *See* Maj. Op. p. 15 (emphasis added). Contrary to the majority opinion's description, Justice Alito's concurrence explicitly stated that the Court's holding was limited to the specific speech at issue in that case, *viz.*, speech advocating drug use at a school event. *See Morse*, 551 U.S. at 425 (Alito, J. concurring).

[16] For example, in concluding that *Tinker* applies to off-campus speech, the Eighth Circuit committed the same fundamental misreading of *Tinker* that the district court committed in the instant case. *D.J.M. ex rel D.M. v. Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754, 765 (8th Cir. 2011). Specifically, the Eighth Circuit read wholly out of context the Court's statement in *Tinker* that schools may regulate student speech "in class *or out of it*," 393 U.S. at 513 (emphasis added), in order to hold that the school district in that case was permitted to punish a student for his off-campus online speech pursuant to *Tinker*'s substantial-disruption framework. The majority opinion likewise commits the same error in emphasizing this very language in reasoning that *Tinker* applies to off-campus speech. *See* Maj. Op. p. 15.

qualified immunity for school officials' suppression of *on-campus* speech,[17] the majority opinion then proceeds to determine whether it should evaluate Bell's claim under the *Tinker* framework or under one of the other categorical exemptions for student speech that the Supreme Court or this court has recognized. *See* Maj. Op. pp. 17–18. Then, after determining that the School Board here did not punish Bell because his speech was lewd (*Fraser*) or school-sponsored (*Hazelwood*) or threatened a Columbine-style mass shooting (*Ponce*), the majority opinion summarily concludes via process-of-elimination that the *Tinker* framework *must* be the appropriate framework for evaluating whether Bell's speech is protected or not. *See* Maj. Op. p. 18 ("We therefore analyze Bell's speech under *Tinker*."). But the majority opinion suspiciously neglects to note that not a single one of these precedents has *ever* been applied by the Supreme Court or our Circuit[18] to regulate a student's off-campus

---

[17] The majority opinion in *Morgan* ultimately held that the school officials' conduct of prohibiting students from passing out religious messages on campus violated the constitution. 659 F.3d at 364 (explaining that Judge Elrod's opinion represented the majority opinion on this point). However, the majority of the *en banc* court found that the right announced was not "clearly established." *Id.* The reason that "categorization" of the speech was important in that case was because of Establishment Clause concerns if the speech could be perceived as school-sponsored. *Id.* at 375. The analysis there has little to do with the matters at issue here.

[18] The majority opinion mischaracterizes our precedents by suggesting that we previously have held that *Tinker* applies to purely off-campus speech. *See* Maj. Op. pp. 15, 22. In *Shanley*, we held that school officials violated the First Amendment when they punished students for selling underground newspapers "near but outside the school premises on the sidewalk of an adjoining street, separated from the school by a parking lot." 462 F.2d at 964. Although we held that the speech in question did not meet the *Tinker* standard, *id.* at 970, we did not hold that *Tinker* necessarily can be applied to *uphold* the punishment of a student for purely off-campus speech.

The same is true of our decision in *Sullivan v. Houston Independent School District*, 475 F.2d 1071 (5th Cir. 1973). In *Sullivan,* the court did not apply the *Tinker* substantial-disruption test to assess whether school officials violated the First Amendment. The *Sullivan* court recognized that there is nothing *per se* unreasonable about requiring a high school student to submit written material to school authorities prior to distribution on campus or resulting in a presence on campus, and that it could not be seriously urged that the school's

Internet speech, like Bell's.    Nevertheless, the majority opinion simply assumes that those precedents apply under these circumstances without first conducting any meaningful analysis to justify its logic.    In other words, by comparing apples to oranges, the majority opinion puts the proverbial cart before the horse.    Indeed, as explained above, the *Tinker* standard was invented, in part, to counteract the consequences of speech that actually occurs within the school environment and to take account of school officials' competing interest to "control conduct in the schools."    *See Tinker*, 393 U.S. at 507. Specifically, in *Tinker*, the competing state interest was in avoiding the disruptive consequences of speech that occurs within school.    *See id.* Accordingly, the Supreme Court crafted a specific level of scrutiny (the "substantial-disruption" test) to evaluate restrictions on speech *within school* that strikes a balance between the competing interests at stake.    Even assuming *arguendo* schools had some authority to punish students' off-campus speech, it is therefore simply a *non sequitur* for the majority opinion to reflexively assume that the same analysis should regulate the scope of schools' authority to punish students' expression *off campus*, where the consequences

---

prior submission rule is unconstitutionally vague or overbroad.   475 F.2d at 1076 (citing *Shanley*, 462 F.2d at 960; *Pervis v. LaMarque Indep. Sch. Dist.*, 466 F.2d 1054 (5th Cir. 1972)).   Instead, the court held that the school principal had disciplined a student for failure to comply with the school's rules requiring prior submission to the school principal of all publications, not sponsored by the school, which were to be distributed on the campus or off campus in a manner calculated to result in their presence on the campus. *Id. at 1073, 1076.* The student was disciplined for twice selling newspapers at the entrance of the school campus, to persons entering therein, without making prior submission of the papers, and for using profanity towards the principal ("the common Anglo–Saxon vulgarism for sexual intercourse") and in the presence of the principal's assistants (specifically, "I don't want to go to this goddamn school anyway").   *Id.* at 1074.   Thus, notwithstanding the *Sullivan* court's references to *Tinker* in that decision, that opinion did not hold that the *Tinker* substantial-disruption test applies to off-campus speech.

In sum, contrary to its suggestion that its decision logically follows from our prior precedents, the majority's opinion today is the first time our circuit has ever held that school officials *may* punish students' purely off-campus speech pursuant to the *Tinker* framework.

of the speech in question and the constitutional interests at stake are simply not the same as in *Tinker*.

The majority opinion's flawed logic in this regard stems naturally from a more fundamental error: the majority opinion fails to take seriously the significance of the various constitutional interests that are implicated by its decision to expand *Tinker*'s reach. As detailed above, the particular facts of this case principally concern the First Amendment right of students to speak out on "matters of public concern" when they are away from school by utilizing the unrivaled power of the Internet to make those messages heard. But narrowly focusing on this issue alone ignores the constellation of other constitutional interests that the majority opinion will negatively impact. For example, even when their off-campus expression does not have a "political" or "religious" dimension, children still maintain "significant" First Amendment rights, *Brown*, 131 S. Ct. at 2735–36, which indisputably include a right to express disrespect or disdain for their teachers when they are off campus. *See Kime v. United States*, 459 U.S. 949, 951 (1982) ("[T]he First Amendment does not permit a legislature to require a person to show his respect for the flag by saluting it. The same constitutional principle applies when the legislature, instead of compelling respect for the flag, forbids disrespect."). Further, for purposes of the First Amendment, it is simply irrelevant whether prevailing social mores deem a child's disrespect for his teacher to be contemptible. "The history of the law of free expression is one of vindication in cases involving speech that many citizens may find shabby, offensive, or even ugly." *See United States v. Playboy Entertainment Grp.*, 529 U.S. 803, 826 (2000).

Moreover, the majority opinion's extension of *Tinker* to off-campus speech additionally burdens the long-established constitutional interest of parents in the rearing of their children. The Supreme Court has "consistently

81

recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." *Ginsberg v. New York*, 390 U.S. 629, 639 (1968); *see also, e.g., Troxel v. Granville*, 530 U.S. 57, 65 (2000) (observing that "the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by the Court"); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925) ("The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."). This fundamental right of parents indisputably includes the right to inculcate their children with ideologies and values that the state or mainstream society may consider repugnant. *See, e.g., Meyer v. Nebraska*, 262 U.S. 390, 403 (1923) (holding that a war-era law banning teaching of German language violated parents' substantive due process rights); *accord Morse*, 551 U.S. at 424 (Alito, J., concurring) (observing that "[i]t is a dangerous fiction to pretend that parents simply delegate their authority—including their authority to determine what their children may say and hear—to public school authorities"). The majority opinion's extension of the *Tinker* framework will inevitably frustrate this constitutional right, because school officials will hereinafter be empowered to supplant parents' control over their children's off-campus speech that is critical of their teachers.

In addition, authorizing schools to regulate students' off-campus speech likewise burdens the constitutional interest of fellow citizens in hearing students' off-campus speech. Courts have long recognized that the First Amendment protects not only the right to speak but also the right to receive speech from others. *See, e.g., First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978) (stating that the "First Amendment . . . afford[s] public access to

discussion, debate, and the dissemination of information and ideas"); *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (explaining that the First Amendment "embraces the right to distribute literature . . . and necessarily protects the right to receive it"); *Rossignol v. Voorhaar*, 316 F.3d 516, 522 (4th Cir. 2003) ("The First Amendment . . . protects *both* a speaker's right to communicate information and ideas to a broad audience *and* the intended recipients' right to receive that information and those ideas." (emphasis in original)).    The facts of the instant case poignantly illustrate how the suppression of students' off-campus speech will burden the First Amendment right of other citizens to receive that speech.  As detailed above, Bell authored and publicized his rap song in an effort to raise awareness of a crucial issue to members of his community, *viz.*, the sexual harassment of female students by male school officials.  Receiving this information would be critically important to community members, particularly parents of female students at Itawamba, in order to ensure that such conduct ceased and did not recur.[19]  Nevertheless, by endorsing the School Board's punishment of Bell, the majority's opinion will empower school officials to censor other students' efforts to inform fellow citizens of information that they have the right—and the urgent need—to receive.  *Cf. Lamont v. Postmaster General*, 381 U.S. 301, 308 (1965) (Brennan, J. concurring) ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.").

Exacerbating the violence committed against these constitutional interests is the unprecedented amount of deference that the majority opinion

---

[19] As explained above, allegations that coaches sexually harassed students were nothing new at Itawamba Agricultural High School when Bell composed his rap song.  In 2009, Itawamba coach Bobby Hill was arrested and accused of sending sexually explicit text messages to a minor student.

affords school boards in disciplining off-campus speech pursuant to *Tinker*. Again, Maj. Op. p. 27, and again, Maj. Op. p. 28, and again, Maj. Op. p. 29, the majority opinion emphasizes the extent of "deference" that, in its view, courts are required to provide school board disciplinary decisions under *Tinker*. Contrary to the majority opinion's approach, however, we do not "defer" to schools in interpreting and applying the Constitution. "The authority possessed by the State to prescribe and enforce standards of conduct in its schools, although concededly very broad, must be exercised consistently with constitutional safeguards." *Goss v. Lopez*, 419 U.S. 565, 574 (1975). Further, while it is true that *Tinker* "is *not* a difficult burden," *Cash*, 585 F.3d at 222 (internal quotation marks omitted), this is the very reason that we must *not* apply *Tinker* to off-campus speech, like Bell's. Otherwise, armed with the comfort that courts will simply defer to their decisions, schools will largely have *carte blanche* to regulate students' off-campus speech, thus significantly burdening not only the First Amendment rights of students but also the constitutional rights of their parents and their listeners.

## IV.

As explained above, the Supreme Court has not decided whether, or, if so, under what circumstances, a public school may regulate students' online, off-campus speech, and it is not necessary or appropriate for the majority opinion to anticipate such a decision here. That is because, even if *Tinker* were applicable to the instant case, the evidence does not support the conclusion, as would be required by *Tinker*, that Bell's Internet-posted song substantially disrupted the school's work and discipline or that the school officials reasonably could have forecasted that it would do so.

In considering the School Board's motion for summary judgment, we are required to view the evidence in the light most favorable to Bell, the non-

movant. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014) (per curiam). The majority opinion, however, wholly disclaims this duty by ignoring material facts and refusing to draw inferences in Bell's favor—particularly those facts and inferences clearly evincing that Bell's song was not and could not be regarded as a threat. For example, Bell has been an aspiring musician since he was a young boy. He began writing lyrics as a child and started to pursue a musical career in earnest while in his teens. Like many musical artists, Bell has a stage name, "T-Bizzle," and he regularly[20] records music in a professional studio. Indeed, the very rap that gave rise to this case was recorded at a recording studio off campus called "Get Real Entertainment" records. As he explained to the Disciplinary Committee, Bell considers himself "an artist," and, as explained above, he originally composed and publicized the song in an effort to "speak out" on and raise awareness of an important issue in his community, *i.e.*, sexual harassment of students. Moreover, consistent with his musical aspirations, Bell explained that the version of the song posted to YouTube was also intended to attract the attention of record labels. Further, the screenshot of Bell's Facebook page reveals that his friends who commented on the song viewed it as the product of Bell's musical talent as a rap musician rather than a threat of violence (*e.g.*, "Hey, don't forget me when you're famous" and "Lol . . . been tellin you since we was little . . . you got all the talent in the world . . ."). In addition, no one—neither Wildmon, Rainey, nor any other teacher or school official—testified that s/he thought Bell, himself, subjectively intended to cause anyone to fear that Bell personally would harm any person. Nor was there any evidence that Bell was a dangerous person or that he had ever engaged in violent or unlawful conduct. Although Bell in his rap song

---

[20] "Once a week," if possible.

referred to a firearm, the evidence does not reflect that Bell had ever owned, possessed, or had any actual experience with firearms. Except for a single tardiness, Bell had an unblemished school conduct record. These crucial facts not only impeach the School Board's contention that Bell's song could reasonably be perceived as a legitimate threat of violence, but also illuminate the fallacies in the majority opinion's comparison between this case and other circuit decisions that have condoned punishment for intentionally violent student speech.[21]

Moreover, the majority opinion likewise either ignores or glosses over other relevant evidence tending to show that school officials did not consider Bell's song threatening but instead punished him merely because they did not like the content of his speech. For example, during the closing remarks of the

---

[21] For example, the majority opinion compares Bell's rap song to the potential violence "signaled" in *Ponce v. Socorro Independent School District*, 508 F.3d 765 (5th Cir. 2007) and *LaVine v. Blaine School District*, 257 F.3d 981, 987 (9th Cir. 2001). But even a cursory comparison between this case and the facts of those cases reveals the majority opinion's flawed logic. In *Ponce*, a student *brought to campus* a private diary, which was written in the first-person narrative, and showed its contents to a classmate. 508 F.3d at 766. The diary detailed the plan of his "pseudo-Nazi" group to conduct coordinated "Columbine-style" shootings at his school and at other schools in the district. *Id.* As the *Ponce* opinion explains:

> The notebook describes several incidents involving the pseudo-Nazi group, including one in which the author ordered his group "to brutally injure two homosexuals and seven colored" people and another in which the author describes punishing another student by setting his house on fire and "brutally murder[ing]" his dog. The notebook also details the group's plan to commit a "[C]olumbine shooting" attack on Montwood High School or a coordinated "shooting at all the [district's] schools at the same time." At several points in the journal, the author expresses the feeling that his "anger has the best of [him]" and that "it will get to the point where [he] will no longer have control." The author predicts that this outburst will occur on the day that his close friends at the school graduate.

*Id.* Likewise, in *LaVine*, a student *brought to campus* a poem written in the first person describing how the narrator murdered without remorse 28 people at his school and which ominously concluded with the narrator's prediction that he "may strike again." *LaVine*, 257 F.3d at 983–84.

No. 12-60264

Disciplinary Committee meeting, one member of the committee provided the following admonition to Bell:

> I would say censor your material. . . . Because you are good [at rapping], but everybody doesn't really listen to that kind of stuff. So, if you want to get [] your message out to everybody, make it where everybody will listen to it. . . . You know what I'm saying? Censor that stuff.  Don't put all those bad words in it. . . . The bad words ain't making it better. . . Sometimes you can make emotions with big words, not bad words.  You know what I'm saying? . . . Big words, not bad words.  Think about that when you write your next piece.

The school's censorial focus on the "bad words" in Bell's song can also be gleaned from the transcript of the preliminary-injunction hearing:

> School Board Lawyer:  You realized what you had done in publishing this song, while it may be, in your perception, an artistic endeavor, was filthy; and it was filled with words like fuck, correct?
>
> Bell: Yes, sir.

Further, although the majority opinion emphasizes Wildmon's testimony that Bell's rap song allegedly scared him, the majority opinion refuses to acknowledge that Rainey testified that he viewed the song as "just a rap" and that "if [he] let it go, it will probably just die down."  In addition to ignoring these material facts, the majority opinion likewise refuses to draw obvious inferences from the record which further evince the fact that school officials did not consider Bell's song to be threatening in nature.  For example, in sharp contrast to other cases in which courts have upheld discipline for a student's purportedly "violent" speech,[22] nothing in the record reflects that school officials ever contacted law enforcement about Bell's song.  To the contrary, Bell's principal drove him home that day, and he thereafter was allowed to

---

[22] *See, e.g., Ponce*, 508 F.3d at 767; *Wynar v. Douglas Cnty. Sch. Dist.*, 728 F.3d 1062, 1065–66 (9th Cir. 2013); *LaVine*, 257 F.3d at 985.

return to classes.  Later, when Bell was suspended pending the outcome of the Disciplinary Committee hearing, he nevertheless was allowed to remain unattended in the school commons for the remainder of the day.   These are simply not the actions of school officials who seriously or reasonably believe a student poses a threat of violence to school officials.

Had the majority opinion properly reviewed all the relevant facts and drawn the clear inferences therefrom, it would have been compelled to conclude that the evidence here does not support a finding, as would be required by *Tinker*, that a "substantial disruption" occurred or that school officials reasonably could have "forecast" a substantial disruption as a result of Bell's rap.  393 U.S. at 514.  As an initial matter, the evidence plainly shows that there was no commotion, boisterous conduct, interruption of classes, or any lack of order, discipline and decorum at the school, as a result of Bell's posting of his song on the Internet. *Cf. Shanley*, 462 F.2d at 970 ("Disruption in fact is an important element for evaluating the reasonableness of a regulation screening or punishing student expression.").   In fact, at the preliminary injunction hearing, Wildmon explained that his students "seem[ed] to act normal" after Bell's rap was released, and Rainey testified that most of the talk amongst students had not been about Bell's song but rather about his suspension and transfer to alternative school.  Aside from the single instance when Wildmon requested a student play the song for him, there was no evidence that any student played the song at school.  Indeed, school computers blocked Facebook, and cellphones were prohibited, which decreased the likelihood that students could access the song on campus.   Further, Bell testified that he never encouraged students or staff to listen to the song at school, and there is no evidence to the contrary.  Tellingly, when asked if she could point to any disruption at the school as a result of Bell's song, the

88

superintendent referred only to the fact that the coaches said that they had altered their "teaching styles" in order to avoid any appearance of initiating or engaging in sexual relationships or harassment with female students.[23]  Yet, neither the superintendent nor the coaches described how this alleged change in "teaching styles" had substantially harmed their ability to teach their assigned courses.  And, in any event, it is self-evident that a teacher's effort to avoid the appearance that he is engaging in sexual relationships with students should be deemed a dictate of the classroom and not a disruption of it.[24]  In sum, even assuming *arguendo* that *Tinker* could be applied to Bell's speech in this case, the School Board failed to satisfy its burden under the "substantial-disruption" framework.

In reaching the opposite conclusion, however, the majority opinion reasons that Bell's "threatening, intimidating, and harassing language . . . could be forecast by [school officials] to cause a substantial disruption." *See* Maj. Op. p. 31.  But, the "evidence" that the majority opinion cites for this conclusion is, at the very best, sorely lacking.  For example, the majority opinion emphasizes that Wildmon and some unnamed "third parties"[25] purportedly perceived Bell's rap song as threatening.  *See* Maj. Op. p. 31.  Yet,

---

[23] For example, Wildmon testified: "I tried to make sure, you know, if I'm teaching, and if I'm scanning the classroom, that I don't look in one area too long. I don't want to be accused of, you know, staring at a girl or anything of that matter."  Rainey testified that he no longer felt he could be as "hands on" with his female members of the track team, and thus "sometimes I tell the boys to go and work with the girls."

[24] Even assuming *arguendo* these changes in the coaches' teaching and coaching styles could be classified as "disruptions," the School Board has not presented any evidence to support a finding that such disruptions were "substantial," as required by *Tinker*.

[25] During a seconds-long aside at the Disciplinary Committee hearing, Bell simply alluded to such statements by third parties.  Neither Bell nor anyone else provided any details whatsoever about these third parties, nor did he specify whether he heard these statements himself or via a third party.

the majority opinion fails to apprehend that an individual's perception of speech is not necessarily tantamount to a rational assessment of that speech nor a valid basis for concluding that such speech is "unprotected" under the First Amendment.  Indeed, regardless of how some individuals might view Bell's speech, no *reasonable* listener could perceive Bell's lyrics as threats in light of the particular context; nor did the particular listeners here.  *See United States v. Jeffries*, 692 F.3d 473, 480 (6th Cir. 2012) ("A reasonable listener understands that a gangster growling 'I'd like to sew your mouth shut' to a recalcitrant debtor carries a different connotation from the impression left when a candidate uses those same words during a political debate. And a reasonable listener knows that the words 'I'll tear your head off' mean something different when uttered by a professional football player from when uttered by a serial killer.").  Critically, the speech at issue in this case occurred in a rap song, a musical genre in which hyperbolic and violent language is commonly used in order to convey emotion and meaning—not to make real threats of violence.  *See, e.g.,* Andrea L. Dennis, *Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence*, 31 Colum. J.L. and Arts 1, 22 (2007).  Further, as detailed above, Bell is a long-aspiring rapper; he composed the song in a professional studio; and he publically broadcast the song to raise public awareness and to attract the attention of record labels. These crucial contextual facts reveal that Bell's song was just that: a song, authored by a young and aspiring musical artist—not the calling card of a would-be killer. The majority opinion therefore errs by relying upon unsubstantiated and unreasonable beliefs that Bell's song was "threatening" in order to support its conclusion that the School Board satisfied its burden under *Tinker*.  *Accord Cash*, 585 F.3d at 221–22 (observing that school "[o]fficials must base their decisions on fact, not intuition") (internal quotation marks omitted).

No. 12-60264

For additional support that *Tinker* is satisfied, the majority opinion also emphasizes the wording of the School Board's Discipline-Administrative Policy. *See* Maj. Op. p. 31. Specifically, the majority opinion derives meaning from the parallels between *Tinker*'s "substantial disruption" framework and the School Board's decision to place the heading "<u>SEVERE DISRUPTIONS</u>" above twenty-one different disciplinary "offenses," one of which is the school's prohibition on "[h]arassment, intimidation, or threatening other students and/or teachers." Under the policy, other "severe disruptions" include, *inter alia*, "stealing," "cutting classes," and "profanity, or vulgarity (to include acts, gestures, or symbols directed at another person.)" According to the majority opinion, this "policy demonstrates an awareness of *Tinker*'s substantial-disruption standard,[26] and the policy's violation can be used as evidence supporting the reasonable forecast of a future substantial disruption." The majority opinion's reasoning in this regard is flawed. As an initial matter, this policy nowhere states that it applies to student conduct or speech that, like Bell's, occurs away from school or school-related activities. In this respect, the policy is facially distinguishable from those on-campus policies in *Morse* and *Fraser* to which the majority opinion analogizes. Moreover, however, the majority opinion's logic is entirely circular. The very task before our court is determining *whether* the School Board's decision to discipline Bell under a school policy comported with constitutional dictates. According to the majority opinion, however, the School's Board's decision to discipline Bell under a school policy is *evidence* that the punishment comported with constitutional dictates. Contrary to the majority opinion's assertions otherwise, this is prototypical *ipse dixit*.

---

[26] The majority opinion cites no evidence to substantiate that the somewhat parallel language is anything more than a mere coincidence.

No. 12-60264

## V.

"[A] 'function' of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Cox v. Louisiana*, 379 U.S. 536, 551–52 (1965). By raising awareness of high school athletic coaches' sexual misconduct toward minor female students, Taylor Bell's rap song had this exact effect, and amongst those most "stir[red] to anger" were Itawamba school officials. The First Amendment prohibited Itawamba from expressing that anger by punishing Bell for the content of his speech. *See Barnette*, 319 U.S. at 637 ("The Fourteenth Amendment . . . protects the citizen against the State itself and all of its creatures—Boards of Education not excepted."). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Indeed, "the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley*, 515 U.S. at 574. The majority opinion, however, forsakes its duty to uphold this most elementary and important of our Constitution's guarantees.

In its conclusion, the majority opinion observes that the "mission" of schools is "to educate." Maj. Op. p. 32. Yet, the majority opinion fails to apprehend the breadth of what an "education" encompasses. As the Supreme Court has explained, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). Teachers are "charge[d] . . . with the task of [i]mbuing their students with an understanding of our system of democracy." *New Jersey v. T.L.O.*, 469 U.S. 325, 354 (1985) (Brennan, J., concurring in part

92

and dissenting in part). "That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Barnette*, 319 U.S. at 637. "[E]ducation prepares individuals to be self-reliant and self-sufficient participants in society." *Wisconsin v. Yoder*, 406 U.S. 205, 221 (1972). Accordingly, "students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

Viewed in the light of these longstanding principles, Bell's song was not a disruption of school activities but rather was an effort to participate as a citizen in our unique constitutional democracy by raising awareness of a serious matter of public concern. Yet, rather than commending Bell's efforts, the Itawamba County School Board punished him for the content of his speech, in effect teaching Bell that the First Amendment does not protect students who challenge those in power. The majority opinion teaches that same mistaken lesson to all the children in our Circuit. Indeed, in concluding that the First Amendment officially condones Bell's censoring and punishment by the School Board, instead of safeguarding his freedom of speech, the majority opinion undermines the rights of all students and adults to both speak and receive speech on matters of public concern through the Internet.

For these reasons, I respectfully and earnestly dissent.

No. 12-60264

EDWARD C. PRADO, Circuit Judge, dissenting:

I agree with Judge Dennis's dissent that Bell's rap song constitutes expressive speech protected by the First Amendment and that the school's discipline for that speech violated the First Amendment under existing Supreme Court precedent. I therefore respectfully dissent and join Judge Dennis's dissent in part.[1]

I write separately because off-campus online student speech is a poor fit for the current strictures of First Amendment doctrine, which developed from restrictions on other media, and I hope that the Supreme Court will soon give courts the necessary guidance to resolve these difficult cases. *See* David L. Hudson, Jr., *The First Amendment: Freedom of Speech* § 7:6 (2012) ("[T]he next frontier in student speech that the U.S. Supreme Court will explore is online speech."). This issue has divided the circuits and state supreme courts. Some have concluded that the *Tinker* standard categorically does not apply to online off-campus speech. *See J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 937 (3d Cir. 2011) (en banc) (Smith, J., concurring) (noting that "[l]ower courts . . . are divided on whether Tinker's substantial-disruption test governs students' off-campus expression"); *see also Thomas v. Bd. of Ed., Granville*

---

[1] I do not join Part I of Judge Dennis's dissent. Unlike the dissent, I would conclude that speech is presumptively protected by the First Amendment unless it fits within a specific category of unprotected speech—regardless of the subject matter of the speech. Thus, I would not extend the doctrinal distinction between private speech and speech on a matter of public concern from the torts and public-employment contexts into the student-speech context.

I also do not join Part II(B) of the dissent. I agree with the dissent's larger point that the majority opinion's standard is vague and will prove difficult to apply; however, I am not as sure as the dissent that the Supreme Court's 1997 decision in *Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997), remains indicative of how the Court would resolve this case today. The Internet has changed dramatically since 1997, so much so that I wonder whether the Court's views on online student speech have evolved to take into account the potential for harm that simply did not exist to the same degree when *Reno* was decided eighteen years ago. *See, e.g.*, *J.S. v. Bethlehem Area Sch. Dist.*, 807 A.2d 847, 863 (Pa. 2002) (observing that "the advent of the Internet has complicated analysis of restrictions on speech").

*Cent. Sch. Dist.*, 607 F.2d 1043, 1053 n.18 (2d Cir. 1979) ("[W]e believe that [the] power [to regulate expression] is denied to public school officials when they seek to punish off-campus expression simply because they reasonably foresee that in-school distribution may result."). Some courts have assumed without deciding that *Tinker* applies. *See, e.g.*, *J.S.*, 650 F.3d at 928–31 (majority op.). And some courts have held that *Tinker* applies to online off-campus speech if "it was foreseeable . . . [that the] conduct would reach the school via computers, smartphones, and other electronic devices," *Kowalski v. Berkeley Cnty. Schs.*, 652 F.3d 565, 574 (4th Cir. 2011), or if there is a "sufficient nexus between the website and the school campus to consider the speech as occurring on campus," *J.S. v. Bethlehem Area Sch. Dist.*, 807 A.2d 847, 865 (Pa. 2002). I am unaware of a circuit or state supreme court going as far as the majority in this case and holding that threatening, harassing, or intimidating online speech that occurred purely off campus may be prohibited or punished. The majority's holding appears to depart from the other, already divided circuits in yet another direction.

Bell's speech does not fit within the currently established, narrow categories of unprotected speech, and I would wait for the Supreme Court to act before exempting a new category of speech from First Amendment protection. As we previously stated in *Porter v. Ascension Parish School Board*, the *Tinker* standard only applies to substantially disruptive "student speech *on the school premises*." 393 F.3d 608, 615 (5th Cir. 2004) (emphasis added) (internal quotation marks omitted); *see also id.* at 615 n. 22 (criticizing other courts for "[r]efusing to differentiate between student speech taking place on-campus and speech taking place off-campus"). Schools officials may also punish speech that advocates illegal drug use and that takes place at off-campus school-sanctioned activities during school hours. *Morse v. Frederick*, 551 U.S.

393, 400–01 (2007) (*citing Porter*, 393 F.3d at 615 n.22); *see also id.* at 425 (Alito, J., concurring) (reasoning that the location of the speech matters and that, "due to the special features of the school environment, school officials must have greater authority to intervene before speech leads to violence"). But this exception does not apply to purely off-campus speech. *See id.* at 405 (majority op.) ("Had Fraser delivered the same speech in a public forum outside the school context, it would have been protected.").

Moreover, Bell's speech does not fall within the First Amendment exception we have previously recognized for student speech that threatens "violence bearing the stamp of a well-known pattern of recent historic activity: *mass, systematic school-shootings* in the style that has become painfully familiar in the United States." *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 770–71 (5th Cir. 2007) (emphasis added). Indeed, in *Ponce*, we emphasized the narrow scope of this exception, concluding that this exception does not include "threats of *violence to individual teachers*[, which should be] analyzed under *Tinker*" or not at all, *id.* at 771 n.2 (emphasis added), meaning that threatening language about an individual teacher is not within the *Morse* exception and may be punished only if it is either "on school premises" within the meaning of *Tinker*, *Porter*, 393 F.3d at 615, or if it constitutes a true threat. We reasoned: "Such threats [to teachers], because they are relatively discrete in scope and directed at adults, do not amount to the heightened level of harm that was the focus of both the majority opinion and Justice Alito's concurring opinion in *Morse*." *Ponce*, 508 F.3d at 771 n.2 (citing *Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978 (11th Cir. 2007); *Wisniewski v. Bd. of Educ. of the Weedsport Cent. Sch. Dist.*, 494 F.3d 34 (2d Cir. 2007)). "The harm of a *mass school shooting* is, by contrast, so devastating and so particular to schools that *Morse* analysis is appropriate." *Id.* (emphasis added).

No. 12-60264

In this case, Bell's rap song was performed and broadcasted entirely off-campus, and the song described violence directed at individual teachers—not a Columbine-type mass school shooting. Therefore, Bell's rap does not fall within the *Tinker* or the *Morse* categories of unprotected speech under our Circuit's decisions in *Porter* and *Ponce*. Further, in the context of expressive rap music protesting the sexual misconduct of faculty members, no reasonable juror could conclude that Bell's rap lyrics constituted a "true threat." *See Virginia v. Black*, 538 U.S. 343, 359 (2003) ("'True threats' encompass [only] those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."). Therefore, I would reverse the district court and render judgment for Bell.

I therefore agree with Judge Dennis's dissent that our Circuit should hesitate before carving out a new category of unprotected speech.

Even so, I share the majority opinion's concern about the potentially harmful impact of off-campus online speech on the on-campus lives of students. The ever-increasing encroachment of off-campus online and social-media speech into the campus, classroom, and lives of school students cannot be overstated. *See Kowalski*, 652 F.3d at 567–69, 571 (confronting a situation in which one high-school student created a webpage dedicated to spreading rumors about the sexually transmitted disease of another student and her supposed sexual promiscuity, thereby "singl[ing] out [that student] for harassment, bullying and intimidation"). Ultimately, the difficult issues of off-campus online speech will need to be addressed by the Supreme Court.

For the foregoing reasons, I respectfully dissent.

97

No. 12-60264

HAYNES, Circuit Judge, dissenting in part:

I respectfully dissent from the portion of the majority opinion affirming the district court's grant of summary judgment in favor of the School Board on Bell's claim.[1] I conclude that the majority opinion greatly and unnecessarily expands *Tinker* to the detriment of Bell's First Amendment rights. I would reverse the district court's grant of summary judgment to the School Board and remand for further proceedings on those matters for substantially the same reasons set forth in Section III of the original panel majority opinion. *See Bell*, 774 F.3d at 290–303.

---

[1] Credibility and inferences matter here, so I would not reverse the denial of Bell's summary judgment motion.

No. 12-60264

JAMES E. GRAVES, JR., Circuit Judge, dissenting:

I join Judge Dennis's dissenting opinion. Like Judge Dennis, my view is that the *Tinker* framework was not intended to apply to off-campus speech. I recognize, however, that current technology serves to significantly blur the lines between on-campus and off-campus speech. In the light of this undeniable reality, and in the alternative, I would apply a modified *Tinker* standard to off-campus speech. My *Tinker-Bell* standard would begin with the *Tinker* substantial disruption test. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969); *see also Shanley v. Ne. Indep. Sch. Dist.*, 462 F.2d 960 (5th Cir. 1972). It would further include a nexus prong that is derived most significantly from the Fourth Circuit's nexus test in *Kowalski v. Berkeley County Schools*, 652 F.3d 565 (4th Cir. 2011). The nexus prong would incorporate the important factors, considered by other appellate courts, of foreseeability and the speech's predominant message.

This standard would protect the First Amendment rights of students to engage in free expression off campus, while also recognizing that school officials should have some ability, under very limited circumstances, to discipline students for off-campus speech. Mindful of these core principles and concerns, I would apply the following test.

> In order for a school to discipline a student for off-campus speech, the school must:
>
> (1) provide evidence of facts which might reasonably have led school authorities to forecast a substantial disruption OR evidence of an actual, substantial disruption;[1] AND
> (2) demonstrate a sufficient nexus between the speech and the school's pedagogical interests that would justify the

---

[1] *Tinker*, 393 U.S. at 509, 513–14; *see also Shanley*, 462 F.2d at 974 ("We emphasize . . . that there must be demonstrable factors that would give rise to any reasonable forecast by the school administration of 'substantial and material' disruption of school activities before expression may be constitutionally restrained.").

No. 12-60264

school's discipline of the student.[2]  In this regard, I would consider three non-exclusive factors:

    a. whether the speech could reasonably be expected to reach the school environment.[3]

    b. whether the school's interest as trustee of student well-being[4] outweighs the interest of respecting the traditional parental role[5] in disciplining a student for off-campus speech . . .

        i. giving particular weight to evidence, experiential or otherwise (like the bullying research in the Fourth Circuit's *Kowalski* decision),[6] which indicates that particular off-campus speech has a unique and *proven* adverse impact on students and the campus environment.

    c. whether the predominant message of the student's speech is entitled to heightened protection.[7]

---

[2] *See Kowalski*, 652 F.3d at 573 ("There is surely a limit to the scope of a high school's interest in the order, safety, and well-being of its students when the speech at issue originates outside the schoolhouse gate.  But we need not fully define that limit here, as we are satisfied that the nexus of [the student's] speech to [the high school's] pedagogical interests was sufficiently strong to justify the action taken by school officials in carrying out their role as the trustees of the student body's well-being.").

[3] *See Wisniewski v. Bd. of Educ.*, 494 F.3d 34, 38–39 (2d Cir. 2007), *cert. denied*, 128 S. Ct. 1741 (2008) (expanding the reach of *Tinker* to include off-campus speech that is reasonably foreseeable to "come to the attention of school authorities"); *Doninger v. Niehoff*, 527 F.3d 41, 50 (2d Cir. 2008) (applying *Tinker* to off-campus speech where the speech is reasonably foreseeable to reach the school property); *D.J.M. v. Hannibal Pub. Sch. Dist.*, 647 F.3d 754, 766 (8th Cir. 2011) (same, where speech was reasonably foreseeable to be brought to the attention of school authorities).

[4] *See Kowalski*, 652 F.3d at 573.

[5] Our court has held in high regard the traditional role of parents to discipline their children off campus.  *See Shanley*, 462 F.2d at 964 ("It should have come as a shock to the parents of five high school seniors . . . that their elected school board had assumed suzerainty over their children before and after school, off school grounds, and with regard to their children's rights of expressing their thoughts."); *id.* at 966 (explaining that the parents filed the lawsuit in "objecti[on] to the school board's bootstrap transmogrification into Super-Parent").

[6] *Kowalski*, 652 F.3d at 572.

[7] *See* Section I of Judge Dennis's dissenting opinion; *see also Bell v. Itawamba Cnty. Sch. Bd.*, 774 F.3d 280, 299 n.46 (5th Cir. 2014), *rev'd en banc.*

No. 12-60264

In my view, if this test were applied to the facts of this case, the school's discipline of Bell would clearly fail. For this additional, alternative reason, I dissent.